**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Albert LAUCHLI, Jr., Defendant-Appellant.**

**Nos. 15586, 15587.**

United States Court of Appeals
Seventh Circuit.

Dec. 5, 1966.

---

Robert B. Oxtoby, Springfield, Ill., Robert A. Sprecher, Chicago, Ill., for appellant.

Richard E. Eagleton, U. S. Atty., Springfield, Ill., for appellee.

Before DUFFY, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal concerns defendant's conviction of violations of the National Firearms Act of 1934 (26 U.S.C. Sections 5801–5862) and Federal Firearms Act of 1938 (15 U.S.C. Sections 901–909). Under the earlier statute, the defendant was found guilty of manufacturing firearms without paying the requisite tax and without registering. He was also found guilty of transferring machine guns without paying the applicable tax, without obtaining the prescribed written orders from the transferees and without affixing tax stamps to the orders.

Under the 1938 statute, the defendant, as a previously convicted felon, was found guilty of shipping parts from partially scrapped Thompson sub-machine guns to Denver, Colorado, and Omaha, Nebraska. Finally, he was found guilty

of receiving firearm parts from Baltimore, Maryland, and Provo, Utah.

Sentence was suspended on four of the 1934 Act Counts; as to the remaining eight Counts, four under each statute, defendant received concurrent sentences of two and one-half years each.

The defense of entrapment as a matter of law is the principal ground urged on appeal with respect to the National Firearms Act Counts. In order to comprehend this defense, it is necessary to set forth the facts in some detail.

In February 1964, defendant Richard Lauchli drove a truckload of weapons and operable parts from his machine shop in Collinsville, Illinois, to the Cicero, Illinois, home of his friend Charles Von Kriegsfield, who was purchasing them from Lauchli. On that occasion, Thomas Mosley, a bus driver for the Chicago Transit Authority, was also visiting the home of Von Kriegsfield. Mosley, who was a Government informer,[1] told Lauchli that a General Joseph Camillo was parked outside Von Kriegsfield's home and was interested in purchasing guns. Lauchli said that he was not interested in meeting the General. Mosley pointed out that the General wanted to purchase fully operative guns rather than the unassembled guns that Lauchli had brought to Von Kriegsfield's house. General Camillo was actually Fortino Gutierrez, an investigator for the Alcohol and Tobacco Tax Unit of the Treasury Department. Lauchli testified that he was not interested in dealing with Camillo at first because Camillo was a customer of Lauchli's friend Von Kriegsfield. Later Lauchli decided that he would be interested in ridding himself of Von Kriegsfield as a middleman.

On April 3, 1964, Mosley and General Camillo called on Lauchli at his home in Collinsville, Illinois. They said they had obtained his name and address by copying them from his truck outside Von Kriegsfield's house during their February visit there. At this time, the de-

---

1. Mosley was also the Government informer in United States v. Georgiou, 333 F.2d 440 (7th Cir. 1964), certiorari denied 379 U.S. 901, 85 S.Ct. 191, 13 L.Ed.2d 176.

fendant offered to sell the General 100 Thompson machine guns without barrels. The guns would not be operable without barrels. Lauchli suggested that the General contact J. Hall Sharon in Kalispell, Montana, for the barrels. Lauchli believed the General to be an anti-Castro Cuban or Chilean.

On the next day, Camillo told Lauchli that he was unable to reach Sharon in Montana. Lauchli said that if the General and Mosley bought the firearms he had left at Von Kriegsfield's house in Chicago, Lauchli would obtain the necessary barrels and put 100 Thompson machine guns in firing condition. Camillo agreed to buy the Chicago stock in order to complete the bargain for the machine guns.

On April 9th, the defendant told Mosley and Camillo that he had ordered the barrel stocks from Montana and that the guns would be ready on May 3rd. On April 29th, Lauchli confirmed that Sharon had already sent the barrels from Montana. On that date, Camillo bought a Bren machine gun from Lauchli, although Lauchli was unable to find the necessary bipod to make the gun operate automatically. At this time, Lauchli instructed Mosley and Camillo to ask for "Gary Patrick" whenever telephoning Lauchli. The cladestine nature of Lauchli's activities was also reflected in his advertised statement to would-be Thompson demilitarized machine-gun customers that their names would not be divulged.

On May 12th, Mosley and Camillo again visited Lauchli at his Collinsville machine shop. During the interval, Lauchli had found the bipod for the Bren. He fired it automatically for his visitors after attaching the bipod at his father-in-law's farm. On May 18th, from Chicago, Mosley and Camillo telephoned Lauchli, who told them the guns were not yet ready. They told Lauchli that their truck was already enroute to Collinsville and the guns would have to be ready the next day.

On May 19th, Camillo and Mosley and their driver, James Scott, appeared in a truck at Lauchli's Collinsville machine shop. The unassembled Thompson and Browning machine guns had been sorted into piles and Lauchli was ready to sell them to Camillo and Mosley for the agreed price of $150 apiece or a total of $17,000. During the interval from April 5th until May 19th, Lauchli had been busy, personally and through others, putting the guns into workable condition. Mosley and Camillo invited Lauchli to join them at a farm near Wapella, Illinois, where they agreed to pay Lauchli the $17,000 after Lauchli assembled and fired some of the machine guns. Lauchli did not consider the Thompson machine guns to be firearms as they left his premises but thought they would become so after assembly. At the Wapella farm, Lauchli assembled seven of the machine guns, of which three fired single shots and one fired automatically. Before defendant assembled the seven machine guns, he and his friend Donald Sturgis searched the various farm buildings for possible observers. During this search, the defendant and Sturgis were heavily armed. Sturgis remained armed and stood guard the whole time they were on the farm.

Lauchli and Sturgis fled the Wapella farm with the $17,000 after being frightened away by a low-flying private plane. When they left the farm, three of the machine guns were still assembled there. Before leaving, Lauchli gave Camillo an instruction booklet explaining how to assemble the guns.

In addition to the Thompson and Browning machine guns he sold Mosley and Camillo, Lauchli still has 1,000 demilitarized machine guns spread over two states. Lauchli has refused to divulge their whereabouts.

In his testimony Lauchli admitted that he had previously pleaded guilty to unlawful possession of firearms in violation of the National Firearms Act of 1934 and had been fined $100 for that violation in 1957. Lauchli also admitted that he had been convicted upon a guilty plea of stealing 23 bazookas from the Jefferson Proving Grounds in Madison, Indiana, resulting in his receiving a sus-

pended sentence of two years and a $500 fine in 1960. He was also violating the Federal Firearms Act of 1938 shortly before the transactions with Mosley and Camillo. See *infra*, p. 313.

### Entrapment Defense

In his motion for a new trial, the defendant asserted that the trial court improperly denied his motion for acquittal made at the conclusion of the evidence in view of defendant's allegedly unlawful entrapment as a matter of law. We conclude that the District Court correctly left this question to the jury.

The leading entrapment case is Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. There the Supreme Court pointed out that it is permissible for Government officers or employees to use artifice and stratagem to catch those engaged in criminal enterprises. However, it is impermissible for them to "implant in the mind of an innocent person the disposition to commit the alleged offense ánd induce its commission in order that they may prosecute." 287 U.S. at pages 441, 442, 53 S.Ct at page 212. Chief Justice Hughes observed that there was sufficient evidence to warrant a finding that defendant had no previous disposition to violate the National Prohibition Act "but was an industrious, law-abiding citizen * * * otherwise innocent" 287 U.S. at page 441, 53 S.Ct at page 212). Accordingly, the Court concluded that the trial judge had erroneously refused to submit the entrapment issue to the jury.

The next entrapment case to be decided by the Supreme Court was Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819,

2 L.Ed.2d 848. There the Court adhered to the *Sorrells* emphasis upon the predisposition of the defendant. Sherman had been trying to overcome the narcotics habit but was enticed into an illegal sale and return to the habit of use. Although the jury had rejected the entrapment defense in *Sherman*, the Supreme Court reversed, commenting that otherwise "the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." 356 U.S. at page 376, 78 S.Ct. at page 822. Entrapment as a matter of law was established by the undisputed testimony of the Government informer. However, the *Sherman* case reaffirmed the *Sorrells* rule that the entrapment issue is normally for a jury and does not constitute a defense if "the defendant's criminal conduct was due to his own readiness" *(idem.)* [2]

Entrapment was last considered by the Supreme Court in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462, where the entrapment defense was left to the jury. The Court refused to reexamine its previous rulings that the entrapment question is for the jury and must take into account the predisposition of the defendant. In affirming the conviction, the Court noted that the Government agent was affording the defendant "an opportunity for the continuation of a course of criminal conduct, upon which * * * [he] had earlier voluntarily embarked" (373 U.S. at page 436, 83 S.Ct. at page 1386).

In considering defendant's argument that entrapment under the Na-

---

2. The tests enunciated in the Sorrells and Sherman opinions have been followed in Illinois. People v. Outten, 13 Ill.2d 21, 26, 147 N.E.2d 284, 287 (1958); see also Ill.Rev.Stats.1965, Ch. 38, Section 7–12. Under the Model Penal Code and in Illinois, the defendant has the burden of proving the affirmative defense of entrapment. See People v. Outten, supra. In other jurisdictions, the burden has been split. The accused has the burden on whether the agent induced him to commit the offense charged; if so, the pros-

ecution has the burden on whether the accused was ready and willing to commit the offense. United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952); Kivette v. United States, 230 F.2d 749, 754 (5th Cir. 1956), certiorari denied, 355 U.S. 935, 78 S.Ct. 419, 2 L.Ed.2d 418; Hansford v. United States, 112 U.S. App.D.C. 359, 303 F.2d 219, 224 (1962); Whiting v. United States, 321 F.2d 72, 75, note 6 (1st Cir. 1963), certiorari denied, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed. 2d 114.

tional Firearms Act of 1934 was shown as a matter of law, we must view the evidence in the light most favorable to the Government. United States v. Armstrong, 339 F.2d 1015, 1016 (7th Cir. 1964), certiorari denied, 381 U.S. 905, 85 S.Ct 1452, 14 L.Ed.2d 287. However, the entrapment testimony of the defendant harmonizes with that of informer Mosley and Agent Gutierrez (General Camillo).

■■ Applying the principles of the *Sorrells* and *Sherman* cases, which the Supreme Court did not see fit to disturb in *Lopez* and are therefore binding upon us, we conclude that the District Court properly referred the entrapment defense to the jury. Although, as suggested by the minority opinions in *Sorrells* and *Sherman*, the American Law Institute's Model Penal Code requires that the issue of entrapment be tried by the court in the absence of the jury [3], existing law still puts the entrapment issue to the jury.[4] Also, under existing law, the defense of entrapment is to be rejected if the defendant had a prior disposition to commit the offense.[5]

In this case, Lauchli's two previous convictions showed a previous disposition to engage in firearm violations. Also, he was presently engaging in violations of the Federal Firearms Act of 1938 (see *infra*, p. 313). The evidence here

does not demonstrate that defendant was reluctant to engage in this criminal activity. He initially refused to see General Camillo at Von Kriegsfield's house but told Mosley of his willingness to sell Camillo the firearms he had brought from Collinsville to Cicero. At the first discussion between Lauchli and Camillo, Lauchli agreed to sell the Thompson machine guns in question and on the next day even promised to secure the barrels therefor. Certainly these facts were enough to create a jury issue as to defendant's continuing criminal disposition.

In his closing argument, the prosecutor told the jury that Lauchli might have an entrapment defense if the jury found that Camillo and Mosley originally placed the idea of selling Thompson machine guns in Lauchli's mind. The jury gave particular care to the entrapment defense, for the jury returned to the courtroom during its deliberations in order to have the District Judge repeat his entrapment instruction. The instruction given was identical to that adopted by Judge La Buy's Committee on Jury Instructions. 33 F.R.D. 523, 557–560. This instruction is in use in this Circuit and has at least twice been approved by this Court. United States v. Armstrong, 339 F.2d 1015, 1018 (7th Cir. 1964), certiorari denied, 381 U.S. 905, 85 S.Ct.

3. See Section 2.13(2) of the proposed official draft of May 4, 1962.

4. Jury trial of the entrapment issue is favored in Note, "The Defense of Entrapment", 73 Harvard Law Review 1333, 1334 (1960). The Note writer proposes a tripartite test, first determining whether the police conduct may have induced the criminal act. If so, the next question to be examined is whether stealthy tactics are needed, and the author recognizes that enforcement requires stealth in connection with victimless crimes such as the sale of firearms. The third step is to determine whether defendant had been engaged in a course of prior similar criminal activities. (Idem at page 1337.) Applying the three steps here would defeat the entrapment defense.

5. The American Law Institute's Council approved the first alternative in the 1959

draft of the American Law Institute's Model Penal Code that rejected the defense of entrapment if the defendant were predisposed to commit the crime involved. This accorded with the majority opinion in the *Sorrells* and *Sherman* cases. The 1962 draft of the Model Penal Code instead adopted the minority view of the *Sorrells* and *Sherman* cases, disregarding the predisposition of the defendant and concentrating on the conduct of the Government officers. This view is supported in Donnelly, "Judicial Control of Informants, Spies, Stoolpigeons and Agents Provocateurs", 60 Yale L.J. 1091, 1114 (1951); see also Note, "Entrapment by Government Officials," 28 Columbia L.Rev. 1067, 1068 (1928). Illinois has adopted a test like the main formulation in the 1959 draft of the Model Penal Code. Ill.Rev.Stats.1965, Ch. 38, Section 7–12.

1452, 14 L.Ed.2d 287; United States v. Aulet, 339 F.2d 934, 936 (7th Cir. 1964), certiorari denied, 380 U.S. 974, 85 S.Ct. 1335, 14 L.Ed.2d 269. On the evidence adduced, the jury could find that defendant had been engaged in similar crimes and was willing to violate the law, thus abrogating this defense. United States v. Perkins, 190 F.2d 49, 52 (7th Cir. 1951).

■ Defendant urges that entrapment was shown as a matter of law in view of the $17,000 price ($150 each) the Government offered for these guns. Although Lauchli had purchased them cheaply, he was advertising the guns for sale at $80 each in their demilitarized state. Mosley and Camillo had promised Von Kriegsfield $150 for such guns, of which Lauchli was to receive $90. The extra $60 windfall was coming to Lauchli only after he decided to dispense with Von Kriegsfield as the middleman. In order to cause Mosley and Camillo to purchase the guns, defendant had to devote weeks of his own and other contractors' time to their improvement and also had to purchase barrels and various kinds of springs to make them saleable to the Government. In the light of these facts, it cannot be said that the gap between Lauchli's advertised $80 price for the unimproved "demils" and the $150 price offered by the Government caused his "ready complaisance". Cf. United States v. Becker, 62 F.2d 1007, 1008 (2nd Cir. 1933).

■ Defendant also contends that he was unlawfully entrapped because the prosecutor had previously promised defendant an advance conference before any action was taken against him. Actually, the short conversation between defendant and the prosecutor concerned an unimproved, rusty Thompson "demil", and defendant did not reveal his past felonies nor mention that he might sell operative Thompson submachine guns. The prosecutor only agreed to let Lauchli know before the Alcohol and Tobacco Tax Unit confiscated his guns. Subsequently, Judson Doyle of the Alcohol and Tobacco Tax Unit did request Lauchli to surrender the demilitarized Thompson machine guns, thus warning defendant that the Government considered him to be violating the National Firearms Act of 1934. After such a warning, Lauchli chanced a conviction by agreeing to do business with Mosley and Camillo.

Defendant relies on United States v. Klosterman, 248 F.2d 191, 69 A.L.R.2d 1390 (3rd Cir. 1957), in support of his argument that entrapment at law occurred here. However, in that case there was clear evidence of the defendant's reluctance to commit bribery, and the Government agents had to exercise an "inordinate amount of persuasion" in causing the offense to be committed. Likewise, in United States v. Campbell, 235 F.Supp. 190 (E.D.N.Y.1964), defendant had no disposition to engage in wagering and was importuned to do so by a friend of 40 years acting at the prompting of agents of the Internal Revenue Service. In contrast to *Klosterman* and *Campbell*, as already noted, there was sufficient evidence here to support the jury's finding that defendant had a ready disposition to commit this type of offense and needed little persuasion to do so.

The defendant attempts to reinforce his entrapment views by reference to the exemptions in Sections 5812 and 5821 of the National Firearms Act (26 U.S.C. Sections 5812 and 5821). The former applies to transfers of firearms to the United States Government or to designated officers thereof, whereas the latter applies to the making of firearms for the use of the United States Government or its designated officers. Insofar as defendant was concerned, these transfers were to General Camillo, and the making of these firearms was for his use in revolutionary activities. Neither Camillo nor Mosley was designated by the Secretary of the Treasury as an exempt Federal officer. Moreover, Lauchli made no attempt to comply with the notification requirements of the regulations. See 26 CFR Sections 179.84 and 179.105.

# 310

## Perjured Testimony

■ Defendant next argues that informer Mosley's testimony was perjured. On direct examination Mosley testified that on April 3, 1964, Lauchli told Mosley and Camillo that in the past he had supplied guns to Castro, to the anti-Castro movement, to the Minutemen group and indirectly to the John Birch Society. To aid defense counsel in his cross-examination of Mosley, pursuant to the Jencks Act (18 U.S.C. Section 3500), he was given the related portion of Mosley's pretrial statement to Government Agent Brennan.

In the Section 3500 statement, Mosley recounted a February 20, 1964, conversation with Von Kriegsfield and Camillo. In that conversation, Von Kriegsfield told Mosley and Camillo "that his unnamed associate is now supplying anti-Castro forces in Miami and that this 'friend down below' is dealing with the Minutemen and indirectly with the John Birch Society."

Later on the same page of the Section 3500 statement, Mosley said that Von Kriegsfield introduced Lauchli to him on February 25th as "the guy with guns for sale." On that occasion, Lauchli told Mosley of the guns he had just brought to Von Kriegsfield's Cicero, Illinois home, and that they were available for sale.

In his cross-examination, Mosley admitted that the only reference to the John Birch Society in his Section 3500 statement was the above February 20th reference. From this, defendant argues that Mosley's testimony about the April 3rd conversation concerning the John Birch Society was a fabrication. However, this is a *non-sequitur*.

When Lauchli was on the stand, his counsel of course had an opportunity to ask him about Mosley's testimony concerning the April 3rd conversation. Instead, defense counsel merely asked Lauchli whether he had ever been a member of the John Birch Society, and only membership was denied. Lauchli in no way controverted Mosley's testimony about the April 3rd conversation. De-

fense counsel could also have questioned Camillo and Lauchli's two friends who were present during the April 3rd conversation but did not choose to do so.

At the trial, defense counsel made no effort to show that the February 20th conversation did not refer to Lauchli. Since Lauchli was revealed as Von Kriegsfield's supplier five days later and since Collinsville, Illinois, is often referred to as "downstate", the jury could properly have interpreted the February 20th conversation to refer to Lauchli. In any event, defense counsel did not object or move to strike Mosley's testimony about the April 3rd statements of Lauchli. It is now too late to complain that the reference to the John Birch Society was prejudicial.

Defense counsel took full advantage of the Section 3500 statement in an effort to impeach Mosley before the jury. Also, this episode was used in defense counsel's closing argument, in his motion for a new trial and in an effort to persuade the District Court to impose only probation. Both the jury and trial court were thus given a full opportunity to pass upon defense counsel's argument that Mosley's testimony was perjured. As was its prerogative, the jury by its verdict credited Mosley's veracity. We conclude that no perjury was shown by a comparison of Mosley's testimony on direct examination with his Section 3500 statement.

## Prejudicial Newspaper and Television Publicity

■ Apparently *sua sponte*, at the start of the second day of the trial, the District Court interrogated the jury concerning an undisclosed newspaper story and television publicity that appeared about the defendant the preceding day. The jurors assured the Court that these matters would not influence their thinking, and that they would still be able to give the defendant a fair and impartial trial. After the Court interrogated the jurors, he gave defense counsel and the prosecutor an opportunity to suggest further questions, but they had none.

Thereupon the Court cautioned the jurors not to read about the trial nor listen to radio broadcasts about it nor view any television about defendant until the trial was completed. At the close of that day's trial, the Court repeated his admonition that the jurors were not to watch television, read newspapers, or listen to the radio. He also warned them not to discuss the trial with anyone. This caution was repeated at the close of the next trial day.

If defense counsel thought the newspaper and television references to defendant were prejudicial, he surely would have so advised the trial court. However, the record is completely devoid of any reference to the contents of the newspaper and television accounts, and defense counsel never urged the District Court to interrogate the jurors more fully than was done. Nothing in this record shows that defendant was prejudiced by this publicity. If it had been detrimental to defendant, there would have been at least some references to its content in the record. In this posture, we are satisfied that the point is devoid of merit. Cf. United States v. Agueci, 310 F.2d 817, 832, 99 A.L.R.2d 478 (2nd Cir. 1962), certiorari denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11; United States v. Carruthers, 152 F.2d 512, 519 (7th Cir. 1946), certiorari denied, 327 U.S. 787, 66 S.Ct. 805, 90 L.Ed. 1014.

Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846, does not help defendant because there the record revealed the patently prejudicial nature of the newspaper publicity and the trial court had refused to put defense counsel's suggested questions to the jury. (Cf. Janko v. United States, 281 F.2d 156, 169 (8th Cir. 1960).) As noted, this record is barren of any reference to the content of the newspaper and television publicity and defendant's counsel was invited by the trial court to suggest additional questions to put to the jury but remained mute. Similarly, in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, the record divulged the highly prejudicial nature of two news accounts that reached the jurors and must have harmed Marshall's cause.

### "Firearms" Under National Firearms Act of 1934

Under the National Firearms Act of 1934, defendant was found guilty on eight of twelve Counts. The first two Counts concerned the manufacture of firearms without paying a tax or registering as a manufacturer. The next three Counts concerned the transfer of a Bren machine gun without paying a tax, without obtaining a written order from the transferee, and without affixing the tax stamp to the order for the gun. The final three Counts concerned the transfer of 109 Thompson and Browning machine guns without paying a tax, without obtaining a written order from the transferee, and without affixing the stamp tax to the order for the guns. As to the last four of these eight Counts, defendant was placed on probation. Two and one-half year concurrent sentences were imposed on the first four Counts.

Defendant argues that there was no violation of the National Firearms Act of 1934 because he did not deal in "firearms" within the definition of the Act or because they were unserviceable curiosities within the statutory exemption.[6]

Section 5848(1) of the National Firearms Act states that "The term 'firearm' means * * * a machine gun * * *." (26 U.S.C. Section 5848(1).) A machine gun is then defined as follows:

"The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." (26 U.S.C. Section 5848(2).)

6. In pertinent part, the exemption clause provides that the National Firearms Act does not apply "to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament" (26 U.S.C. Section 5812(a) (3)).

If the Bren machine gun and the 109 Thompson and Browning machine guns covered in the National Firearms Act Counts are "firearms" and not within the statutory exemption, the convictions under these eight Counts must stand.

As to the three Bren machine-gun Counts, the uncontradicted evidence shows that defendant and Mosley each fired the gun automatically on defendant's father-in-law's farm after defendant had attached the needed bipod found in his machine shop. Defendant testified that he agreed to sell Camillo and Mosley the bipod as well as the machine gun itself. On cross-examination, the defendant admitted that the Bren was an automatic weapon and was outside the exemption clause of the National Firearms Act (26 U.S.C. Section 5812(a) (3)).

As to the remaining five Counts of the National Firearms Act indictment, defendant urges that the convictions were improper on the ground that the 109 Thompson and Browning machine guns were not "firearms" or were exempt.

The evidence shows that Mosley and Camillo were interested in buying operable weapons and so told Lauchli. These machine guns were certainly "designed to shoot, automatically or semi-automatically, more than one shot" within the statutory definition for a machine gun. But to avoid the applicability of the Act, the defendant points to the fact that he only assembled seven of these guns at the Wapella farm. His reliance is upon United States v. Thompson, 202 F.Supp. 503 (N.D.Cal.1962), holding that a sawed-off shotgun without a firing pin was not a firearm within the National Firearms Act.[7] However, that opinion declined to decide whether disassembled guns containing all parts were within the Act, although the court did imply that the Act applies to disassembled guns

that "could be immediately put together and be in operating condition" (202 F. Supp. at p. 507). Unlike *Thompson*, these 109 guns contained all their parts.

The Government observes that it would be too easy to violate the National Firearms Act if disassembly of complete weapons remove them from the purview of the Act. Indeed, Internal Revenue Ruling 54–606 (Cumulative Bulletin 1954–2, p. 33) so recognizes in providing as follows:

"Where an individual, partnership, company, association, or corporation has possession or control of sufficient parts to assemble an operative firearm as defined in section 5848(1) of the Internal Revenue Code of 1954, the possession or control thereof constitutes the possession of a firearm. Further, the transfer as defined in section 5848(10) of such Code, of sufficient parts to assemble an operative firearm is deemed to constitute the transfer of a firearm subject to the tax imposed under section 5811(a) of the Code."

In holding that the transactions concerning the 109 machine guns come within the National Firearms Act of 1934, we need not go so far as the Internal Revenue Ruling. Here the evidence reveals that the purchasers demanded operable machine guns, the defendant assembled seven of them at the Wapella farm, one of the seven was fired automatically by the defendant on that occasion, and five of the weapons (selected at random from the 109) were later fired automatically by a Government expert after assembling and oiling them and stretching a drive spring. The defendant testified that he expected the machine guns to work automatically upon assembly, and he gave Mosley and Camillo a booklet explaining their assembly.

7. In Sipes v. United States, 321 F.2d 174 (8th Cir. 1963), certiorari denied, 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d 150, the gun did not have a firing pin but could nevertheless be fired easily because it contained a nail in place of the firing pin. The court held the weapon to be a firearm and expressly did not decide the *Thompson* question.

As in United States v. Kokin, 365 F.2d 595 (3rd Cir., 1966), certiorari denied, 87 S.Ct. 597 (12/12/66), the defendant seller knew the buyer planned to assemble these firearms, and defendant provided all the necessary materials. As in *Kokin* too, this defendant even assisted in the assembly of seven of the weapons. On cross-examination, he admitted that the assembly of these weapons would violate the 1934 Act. He also testified that he thought the unassembled guns would become firearms. In the circumstances, the transfer of the 109 machine guns here was a transfer within the meaning of the 1934 Act.

Since these machine guns were clearly not transferred as curiosities or ornaments, it is unnecessary to consider the statutory construction question whether they were "unserviceable" within the exemption clause (note 6, supra). Also defendant cannot take advantage of the exemption clause, for he did not send the Secretary of the Treasury or his delegate the notice required by Section 5812(b) (26 U.S.C. Section 5812(b)).

■ At the argument defendant also attacked the vagueness of the term "unserviceable" in the exemption provision, but since, as already stated, these machine guns were not transferred as curiosities or ornaments, it is unnecessary to consider that constitutional question. Certainly the definition clauses involved herein are not void for vagueness, for they provide "sufficient warning" of the purview of the statute. United States v. National Dairy Corp., 372 U.S. 29, 33, 83 S.Ct. 594, 9 L.Ed.2d 561. Defendant has cited no cases in which statutory complexity has been held to create a constitutional infirmity. It may be noted that the constitutionality of this Act has already been sustained. Sonzinsky v. United States, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772.

### *"Firearms" Under Federal Firearms Act of 1938*

Defendant was also found guilty on four Counts under the Federal Firearms Act of 1938. Two of these Counts concerned defendant convicted felon's shipments of firearm parts, contained in partially scrapped Thompson machine guns, to Denver, Colorado, and to Omaha, Nebraska. The remaining two Counts concerned defendant convicted felon's receipt of certain magazines from Baltimore and his receipt of firearm parts contained in 1,651 machine guns from Provo, Utah. The defendant received two and one-half year concurrent sentences on each of these four Counts, to run concurrently with his sentences under the National Firearms Act indictment.

Defendant was admittedly a twice-convicted felon. He testified that he knew that firearm parts were covered by the Federal Firearms Act of 1938, which defines firearms as including "any part or parts" of any weapon designed to expel projectiles by the action of an explosive. 15 U.S.C. Section 901 (3).

■ As to the Thompson machine-gun parts defendant sold to customers in Denver and Omaha, he relies on the following exemption of Section 904 of the Federal Firearms Act (15 U.S.C. Section 904):

"The provisions of this chapter shall not apply with respect * * * to the transportation, shipment, or receipt of any antique or unserviceable firearms, or ammunition, possessed and held as curios or museum pieces * * *".

The Thompson machine guns that defendant shipped to Denver and Omaha undeniably had serviceable parts. Since the definition of firearms in the Federal Firearms Act includes parts, this exemption of course did not apply. Certainly too, these weapons were not "possessed and held as curios or museum pieces" by defendant. Rather, he was engaged in selling them and had so advertised.

■ The next Count under the Federal Firearms Act related to the shipment of Browning automatic rifle magazines or clips from Baltimore to defendant. Because such weapons could not be

fired automatically without the magazines, the District Court properly held they were within the broad reach of the Act as "parts" of a weapon (15 U.S.C. Section 901(3)).

As to the last Count under the 1938 Federal Firearms Act, covering the receipt of firearm parts contained in 1,651 machine guns shipped to defendant from Provo, Utah, there was ample testimony that these guns did contain serviceable parts, thus bringing them within the scope of the Act.

Because there was no testimony that defendant "possessed and held [the various weapons and parts] as curios or museum pieces", it is unnecessary to pass upon his contention about the vagueness of the term "unserviceable" within the aforesaid exemption clause (15 U.S.C. Section 904). As with the National Firearms Act of 1934, the 1938 Act is not impermissibly vague under the standards delineated in United States v. National Dairy Corp., 372 U.S. 29, 83 S.Ct. 594, nor does its so-called complexity contravene the Fifth and Sixth Amendments. The constitutionality of this enactment was upheld in Cases v. United States, 131 F.2d 916 (1st Cir. 1942), certiorari denied, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718.

The judgment of the District Court is affirmed.