**UNITED STATES of America, Plaintiff,**

v.

**ROCK ISLAND ARMORY, INC., and David R. Reese, Defendants.**

No. 90–40025.

United States District Court,
C.D. Illinois,
Rock Island Division.

June 7, 1991.

Bradley Murphy, Asst. U.S. Atty., Peoria, Ill., for plaintiff.

Richard Parsons, Peoria, Ill., for Armory.

Thomas Penn, Peoria, Ill. and Stephen P. Halbrook, Fairfax, Va., for Reese.

ORDER

MIHM, District Judge.

Pending before the Court are Defendants' motion to dismiss the original indict-

---

ment and a motion to dismiss the superseding indictment. On May 24, 1991, the United States filed a motion to dismiss the original indictment of August 23, 1990, in favor of the superseding indictment. That motion is granted. The original indictment is dismissed. The Court finds that Defendants Rock Island Armory, Inc. and David R. Reese have stated a valid challenge to certain counts of the superseding indictment. Accordingly, the Court hereby dismisses Counts 1(a) and (b), 2, and 3 of the superseding indictment.

After oral argument on the above motions, but before entry of a final order, the United States filed a motion to reconsider the Court's decision to dismiss the above counts. After careful consideration, the Court hereby denies the motion to reconsider.

The superseding indictment alleges that Defendants committed acts in respect to the making and registration of "firearms," i.e., machineguns,[1] in the years 1987 and 1988 which violated parts of the National Firearms Act, Chapter 53 of the Internal Revenue Code, 26 U.S.C. §§ 5801 *et seq.* Specifically, Count I alleges in part that Defendants conspired "(a) to manufacture firearms in violation of Title 26, United States Code, Sections 5822[2] and 5861(f)[3] [and] (b) to knowingly deliver into interstate commerce firearms in violation of Title 26, United States Code, Sections 5822 and 5861(j)...."[4] Count 2 alleges that in 1988, Defendants made machineguns "in violation of the registration provisions of Title 26, United States Code, Section 5822," which is alleged to have violated 26 U.S.C. § 5861(f). Count 3 alleges that Defendants delivered into interstate commerce the same machineguns as in Count 2, and that these machineguns "had not been registered as required by the provisions of Title 26, United States Code, Section 5822," in violation of 26 U.S.C. § 5861(j).

Since its passage in 1934, the registration, taxation, and other requirements of the National Firearms Act ("NFA") have been upheld by the courts under the power of Congress to raise revenue.[5] However, 18 U.S.C. § 922(*o*), which became effective on May 19, 1986, prohibits possession of machineguns, and thereby repealed or rendered unconstitutional the portions of the National Firearms Act which provided for the raising of revenue from the making, possession, and transfer of machineguns made after such date. As the government conceded at oral argument, the United States refuses to register or accept tax payments for the making or transfer of machineguns made after 1986.[6] Thus,

---

1. "The term firearm means ... (6) a machinegun...." 26 U.S.C. § 5845(a).

2. 26 U.S.C. § 5822 provides:

   No person shall make a firearm unless he has (a) filed with the Secretary or his delegate a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary or his delegate; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearms to be made in the application form, in such manner as the Secretary or his delegate may by regulation prescribe; (d) identified himself in the application form in such manner as the Secretary or his delegate may by regulation prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtain the approval of the Secretary or his delegate to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possessing of the firearm would place the person making the firearm in violation of the law.

3. 26 U.S.C. § 5861 provides that "it shall be unlawful for any person— ... (f) to make a firearm in violation of the provisions of this chapter...."

4. 26 U.S.C. § 5861 provides that "it shall be unlawful for any person— ... (j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter...."

5. Article I, § 8 of the Constitution provides: "The Congress shall have power to lay and collect taxes, duties, imposts, and excises...."

6. The preface to the superseding indictment states that under federal law and regulation:

   (g) Machine guns registered according to law before May 19, 1986, could be sold to the general public; and
   (h) machineguns registered on or after May 19, 1986, could be sold only to governmental

§ 922(*o* ), as applied to machineguns made after May 19, 1986, left the registration and other requirements of the National Firearms Act without any constitutional basis.

P.L. 99–308, 100 Stat. 449 (May 19, 1986), codified as 18 U.S.C. § 922(*o* ), provides:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) A transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

As interpreted and administered by the Bureau of Alcohol, Tobacco and Firearms ("BATF"), U.S. Department of the Treasury, § 922(*o* ) prohibits the private possession of any machinegun not made and registered before May 19, 1986. Thus, since May 19, 1986, BATF has refused to approve any application to make, transfer, register, and pay the $200 tax on any machinegun made after that date.[7] Before that date, BATF approved such applications pursuant to 26 U.S.C. §§ 5812 and 5822. *Farmer v. Higgins*, 907 F.2d 1041, 1042–44 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991) (upholding BATF's denial of an application to make and register a machinegun by a private collector under § 5822).

As applied to machineguns alleged to be possessed after May 19, 1986, prosecutions may no longer proceed under 26 U.S.C. § 5861. This is because the National Firearms Act is part of the Internal Revenue Code, and its provisions—including registration of machineguns possessed after May 19, 1986—are valid only to the extent they aid in the collection of tax revenue. Since BATF would not register and accept tax payments for any machinegun after May 19, 1986, registration of machineguns made and possessed after that date no longer serves any revenue purpose, and such registration requirements are invalid. Since 18 U.S.C. § 922(*o* ) is interpreted to ban registration and taxation of machineguns under the National Firearms Act, § 922(*o* ) effectively repeals such registration and taxation provisions. Congress has no enumerated power to require registration of firearms. However, since registration of firearms may assist in the collection of revenue, Congress passed the National Firearms Act in 1934 pursuant to its power to tax. Section 922(*o* ) destroys the constitutional basis of registration.

In the 1934 hearings, Attorney General Homer S. Cummings explained in detail how the NFA would be based on the tax power. National Firearms Act: Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 6 (1934).

bodies and police agencies, and not to the general public.

**7.** 27 C.F.R. § 179.105 provides in part:

(c) ... *[M]anufacture....* Manufacturers qualified under this part may ... manufacture machine guns on or after May 19, 1986, for sale or distribution to any department or agency of the United States or any State or political subdivision thereof ... The registration of such machineguns under this part and their subsequent transfer shall be conditioned upon and restricted to the sale or distribution of such weapons for the official use of Federal, State or local governmental entities. Subject to compliance with the provisions of this part, manufacturers qualified under this part may manufacture machineguns on or after May 19, 1986, for exportation in compliance with the Arms Export Control Act (22 U.S.C. 2778) and regulations prescribed thereunder by the Department of State....

(e) *The making of machineguns on or after May 19, 1986.* Subject to compliance with the provisions of this part, applications to make and register machineguns on or after May 19, 1986, for the benefit of a Federal, State or local governmental entity (e.g., an invention for possible future use of a governmental entity or the making of a weapon in connection with research and development on behalf of such an entity) will be approved if it is established by specific information that the machinegun is particularly suitable for use by Federal, State or local governmental entities and that the making of the weapon is at the request and on behalf of such an entity.

Cummings denied that machineguns could be banned, because "we have no inherent police power to go into certain localities and deal with local crime. It is only when we can reach those things under ... the power of taxation, that we can act." *Id.* at 8.

When Congressman Harold Knutson asked "why should we permit the manufacture, that is, permit the sale of the machine guns to any one outside of the several branches of the Government," Congressman Sumners suggested "that this is a revenue measure and you have to make it possible at least in theory for these things to move in order to get internal revenue?" *Id.* at 13–14. Cummings agreed: "That is the answer exactly." *Id.* at 14. The following dialogue ensued:

> Attorney General CUMMINGS.... If we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say, "we will tax the machine gun," ... you are easily within the law.
> Mr. LEWIS. In other words, it does not amount to prohibition, but allows of regulation.
> Attorney General CUMMINGS. That is the idea. We have studied that very carefully.

*Id.* at 19.

The National Firearms Act was originally passed as a taxing statute under the authority of *Nigro v. United States*, 276 U.S. 332, 48 S.Ct. 388, 72 L.Ed. 600 (1928). *See* National Firearms Act: Hearings Before the Committee on Ways and Means, *supra*, at 101–02, 162. Upholding the Harrison Anti–Narcotic Act, *Nigro* noted:

> "In interpreting the act, we must assume that it is a taxing measure, for otherwise it would be no law at all. If it is a mere act for the purpose of regulating and restraining the purchase of the opiate and other drugs, it is beyond the power of Congress and must be regarded as invalid...."

276 U.S. at 341, 48 S.Ct. at 390. The Court added:

Congress by merely calling an act a taxing act cannot make it a legitimate exercise of taxing power under § 8 of article 1 of the Federal Constitution, if in fact the words of the act show clearly its real purpose is otherwise."

*Id.* at 353, 48 S.Ct. at 394.

The committee reports on the National Firearms Act mention the constitutional basis of federal jurisdiction. The House Ways and Means Committee report, which the Senate Finance Committee report repeats verbatim, explained the basis of the NFA in part as follows:

> In general this bill follows the plan of the Harrison Anti–Narcotic Act and adopts the constitutional principle supporting that act in providing for the taxation of fire-arms and for procedure under which the tax is to be collected.

Rept. No. 1780, Committee on Ways and Means, U.S. House of Representatives, 73rd Cong., 2d Sess. 2 (1934); Rept. No. 1444, Committee on Finance, U.S. Senate, 73rd Cong., 2d Sess. 1 (1934).

The Seventh Circuit was the first to enunciate the rule that the National Firearms Act is solely a tax measure. In *Sonzinsky v. United States*, 86 F.2d 486 (7th Cir.1936), *aff'd*, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772 (1937), the Court of Appeals considered the validity of the requirement that a dealer in firearms register with the collector and pay a special excise tax of $200 per year. The Court found the NFA to be constitutionally valid as under the taxing power of Congress in Article I, § 8 of the Constitution. Rejecting the argument that the NFA's real purpose was suppression of crime, the Court held:

> The act ... evidences no announced purpose outside the constitutional authority. [It is] unusually free from *regulative* provisions, merely providing for a tax in varying amount upon different classifications of persons and requiring such persons to register....

*Id.* at 490.

The Supreme Court affirmed the Seventh Circuit in *Sonzinsky*, 300 U.S. 506, 57 S.Ct. 554. The defendant argued:

that the present levy is not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms, the local regulation of which is reserved to the states because not granted to the national government.

*Id.* at 512, 57 S.Ct. at 555. In other words, the defendant contended that the Tenth Amendment power of the states to regulate firearms in their criminal codes was an exclusive power not delegated to the federal government.

The Supreme Court found the National Firearms Act on its face to be a revenue measure and nothing more. The Court noted:

> The case is not one where the statute contains regulatory provisions related to a purported tax in such a way as has enabled this Court to say in other cases that the latter is a penalty resorted to as a means of enforcing the regulations.... Nor is the subject of the tax described or treated as criminal by the taxing statute.... Here Section 2 contains no regulations other than the mere registration provisions, which are obviously supportable as in aid of a revenue purpose. On its face it is only a taxing measure....

*Id.* at 513, 57 S.Ct. at 555.

The Court upheld its validity precisely because the National Firearms Act was a revenue measure only and did not purport to exercise any general criminal power not delegated to Congress by the Constitution. Moreover, the Court refused to speculate into any reasons why Congress might have taxed certain firearms:

> Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of the courts.... They will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution....

Here the annual tax of $200 is productive of some revenue. We are not free to speculate as to the motives which moved Congress to impose it, or as to the extent to which it may operate to restrict the activities taxed. As it is not attended by an offensive regulation, and since it operates as a tax, it is within the national taxing power.

*Id.* at 513–14, 57 S.Ct. at 556.

Since the rule is unquestioned, the Seventh Circuit has had no occasion to consider it further, other than to cite *Sonzinsky* and to note that "the constitutionality of this Act has already been sustained." *United States v. Lauchli,* 371 F.2d 303, 313 (7th Cir.1966).[8]

*Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) invalidated certain registration requirements of the Act as being in violation of the rights against self-incrimination. The court described the registration requirement as "part of the National Firearms Act, an interrelated statutory system for the taxation of certain classes of firearms." *Id.* at 87, 88 S.Ct. at 725. "All these taxes are supplemented by comprehensive requirements calculated to assure their collection.... [For example,] every person possessing such a firearm is obliged to register his possession with the Secretary...." *Id.* at 88–89, 88 S.Ct. at 726.

In *Haynes,* the government argued "that the registration requirement is a valid exercise of the taxing power, in that it is calculated merely to assure notice to the Treasury of all taxable firearms." *Id.* at 98, 88 S.Ct. at 730. Citing *Sonzinsky,* the Court replied:

> We do not doubt, as we have repeatedly indicated, that this Court must give deference to Congress' taxing powers, and to measures reasonably incidental to their exercise; but we are no less obliged to heed the limitations placed upon those powers by the Constitution's other commands. We are fully cognizant of the

**8.** In a second case involving the same defendant, the Court noted that tax stamps for transfer of NFA firearms could be purchased from the Internal Revenue Service like postage stamps, with no information demanded of the buyer. *Lauchli v. United States,* 481 F.2d 408, 410, 412 (7th Cir.1973).

Treasury's need for accurate and timely information, but other methods, entirely consistent with constitutional limitations, exist by which such information may be obtained.

*Id.*

The National Firearms Act was reenacted as Title II of the Gun Control Act of 1968. Congress rejected a proposal that would not have been based on the power to tax. Fred B. Smith, General Counsel of the Treasury Department, noted that the proposal "would make it unlawful for a person under 21 years of age to possess a National Firearms Act firearm." Federal Firearms Act: Hearings Before the Subcommittee to Investigate Juvenile Delinquency, Judiciary Committee, U.S. Senate, 90th Cong., 1st Sess., 1088 (1967). Smith stated:

> It seems doubtful that the ... provision can be justified under the taxing or commerce powers, or under any other power enumerated in the Constitution, for Federal enactment. Consequently, the Department questions the advisability of including in the bill a measure which could be construed as an usurpation of a (police) power reserved to the states by Article X of the United States Constitutional Amendments.

*Id.* at 1089.

Since reenactment of the National Firearms Act, the various circuits have continued to follow the *Sonzinsky* rule. *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir.1972), *cert. denied*, 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 states:

> The test of validity is whether on its face the tax operates as a revenue generating measure and the attendant regulations are in aid of a revenue purpose.... Section 5861(d) making possession of an unregistered weapon unlawful is part of the web of regulation aiding enforcement of the transfer tax provision in section 5811. Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons. Such a penalty imposed on transferees ultimately discourages the transferrer on whom the tax is levied from transferring a firearm without paying the tax.

The prosecution argues that the NFA is still a tax act because criminal violators only will be assessed the "tax." Response to Defendant's Motion to Dismiss the Indictment at 6. This begs the question, because the government refuses to register the making or transfer of a post–1986 machinegun on behalf of an applicant who is not being prosecuted, and will not register any firearm even when it imposes a tax assessment.[9] Thus, the registration requirement—which the government interprets as repealed by § 922(*o*)—is still left without any tax nexus.[10] Moreover, the "tax" assessed cannot be voluntarily paid by a would-be taxpayer, but is paid only by

---

**9.** The prosecution reiterated at oral argument on May 22, 1991, that the United States will not accept tax payments or registrations, but will assess a "tax" only on the illegal making of a machinegun.

**10.** The duty of the Secretary of the Treasury to register firearms, which the government considers to be repealed by 18 U.S.C. § 922(*o*) as to post–1986 machineguns made for the private market, is set forth in 26 U.S.C. § 5841 as follows:

(a) Central registry—
The Secretary or his delegate shall maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States. This registry shall be known as the National Firearms Registration and Transfer Record. The registry shall include—

(1) identification of the firearm;
(2) date of registration; and
(3) identification and address of person entitled to possession of the firearm;
(b) By whom registered—
Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferror.
(c) How registered—
.... Each importer, maker, and transferor of a firearm shall, prior to importing, making, or transferring a firearm, obtain authorization in such manner, as required by this chapter or regulations issued thereunder to import, make or transfer the firearm, and such authorization shall effect the registration of the firearm required by this section.

tax violators. This indicates that the $200 "tax" is really a fine, just as is the $10,000 for which one may be "fined" upon conviction of an NFA offense. 26 U.S.C. § 5871. Since both apply only to NFA criminal violators, both the $200 assessment and the $10,000 fine are "fines," not taxes. Criminal fines are not constitutional as encompassed under Congress' power to raise revenue, but must pass constitutional muster under an enumerated power. Under the prosecution's argument, the federal government could totally usurp all local criminal jurisdiction, under the guise that the fines imposed would really be taxes because they raise revenue.

The above use of the word "fine" was made clear in *Browning–Ferris v. Kelco Disposal,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Commenting on the Eighth Amendment's proscription on "excessive fines," the Court noted that "at the time of drafting and ratification of the Amendment, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *Id.* at 266, 109 S.Ct. at 2915, 106 L.Ed. at 232. Similarly, as stated in *United States v. Mississippi Tax Comm'n,* 421 U.S. 599, 606, 95 S.Ct. 1872, 1877, 44 L.Ed.2d 404 (1975): "An 'enforced contribution to provide for the support of government,' [is] the standard definition of a tax. *United States v. La Franca,* 282 U.S. 568, 572 [51 S.Ct. 278, 280, 75 L.Ed. 551] ... (1931)." The reference to *La Franca,* which invalidated a "tax" on alcohol made illegal by state law, explains:

> By § 35, supra, it is provided that upon evidence of an illegal sale under the National Prohibition Act, a tax shall be assessed and collected in double the amount now provided by law. This, in reality, is but to say that a person who makes an illegal sale shall be liable to

pay a "tax" in double the amount of the tax imposed by pre-existing law for making a legal sale, which existing law renders it impossible to make. A tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act. The two words are not interchangeable, one for the other. No mere exercise of the art of lexicography can alter the essential nature of an act or a thing; and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such.[11]

This issue was again resolved adverse to the government in *United States v. Constantine,* 296 U.S. 287, 294, 56 S.Ct. 223, 226, 80 L.Ed. 233 (1935). A statute provided for a federal assessment for one who violated a state liquor law. The Court held that it would be invalid "if, in fact, its purpose is to punish rather than to tax." *Id.* No federal jurisdiction existed to enforce alcohol Prohibition, because the Eighteenth Amendment had been repealed. *Id.* Similarly, no federal jurisdiction exists to ban mere possession of machineguns, and the NFA provisions at issue are not supported by the tax power to the extent they enforce a prohibition rather than taxation.

As *Constantine* held, "a penalty cannot be converted into a tax by so naming it ... [W]e hold that it is a penalty for the violation of State law, and as such beyond the limits of federal power." *Id.* The Court explained:

> The condition of the imposition is the commission of a crime. This, together with the amount of the tax, is again significant of penal and prohibitory intent rather than the gathering of revenue. Where, in addition to the normal

---

11. This issue was also addressed in *Lipke v. Lederer,* 259 U.S. 557, 561–62, 42 S.Ct. 549, 550–51, 66 L.Ed. 1061 (1922), concerning the National Prohibition Act, which imposed a "tax" on illegal liquor. The Court held:

> The mere use of the word "tax" in an act primarily designed to define and suppress crime is not enough to show that, within the true intendment of the term, a tax was

laid.... When by its very nature the imposition is a penalty, it must be so regarded.... It lacks all the ordinary characteristics of a tax, whose primary function "is to provide for the support of the government," and clearly involves the idea of punishment for infraction of the law,—the definite function of a penalty. *Id.* at 561–62, 42 S.Ct. at 550–51.

and ordinary tax fixed by law, an additional sum is to be collected by reason of conduct of the taxpayer violative of the law, and this additional sum is grossly disproportionate to the amount of the normal tax, the conclusion must be that the purpose is to impose a penalty as a deterrent and punishment of unlawful conduct. We conclude that the indicia which the section exhibits of an intent to prohibit and to punish violations of State law as such are too strong to be disregarded, remove all semblance of a revenue act and stamp the sum it exacts as a penalty. In this view the statute is a clear invasion of the police power, inherent in the States, reserved from the grant of powers to the federal government by the Constitution.

*Id.* at 295–96, 56 S.Ct. at 227.

It is well established that Congress may tax both legal and illegal activities. *Marchetti v. United States*, 390 U.S. 39, 44, 88 S.Ct. 697, 700, 19 L.Ed.2d 889 (1968).[12] Gambling and other acts which may be illegal under state law may be taxed, and registration may be required to assist in collection of the tax as long as registration information is not shared with the police, since such sharing would violate the privilege against self-incrimination. *Id.* Registration is among the "ancillary provisions calculated to assure their [i.e., the taxes] collection." [13] *Id.* at 42, 88 S.Ct. at 699. In contrast with the federal taxation and registration of conduct made illegal under state law, which the courts have upheld, the case at bar involves federal taxation and registration requirements which the government interprets as repealed by a federal statute making post–1986 machineguns illegal. In short, the government registers gamblers and accepts their tax payments; it refuses to accept registrations

and tax payments for the making of machineguns.

The prosecution also asserts that "machine guns may still be manufactured, and therefore taxed, under 18 U.S.C. § 922(*o*)(2)(A)." Response at 6. Yet the government has successfully argued that that provision allows manufacture only for official government use. *Farmer v. Higgins*, 907 F.2d at 1042–44. Manufacture for government use is exempt from any tax. 26 U.S.C. §§ 5852, 5953. Also, this argument fails to address the fact that the United States refuses to register any post–1986 machineguns, thereby severing any tax nexus for this registration requirement, with which compliance is impossible.

In its motion to reconsider, the prosecution reiterates that the government can tax an item or activity which is illegal. Yet the very framing of this proposition presupposes that the activity can and will be taxed. By contrast, in the case at bar, the government interprets 18 U.S.C. § 922(*o*) to prevent the registration and taxation of post–1986 machineguns made for private purposes under the National Firearms Act, 26 U.S.C. § 5801 *et seq.*

The prosecution relies on *Marchetti v. United States*, supra, 390 U.S. at 44, 88 S.Ct. at 700, which held that reporting requirements for taxation of illegal gambling may not violate the privilege against self-incrimination. Yet implicit in *Marchetti* is the rationale that registration provisions are constitutional *if and only if* they assist in collection of revenue. As *Marchetti* states:

> The taxes are supplemented by ancillary provisions calculated to assure their collection. In particular, § 4412 requires those liable for the occupational tax to register each year with the director of the local internal revenue district.

---

**12.** *Marchetti* does not describe pre–1986 law under the National Firearms Act regarding the making of machineguns, because such activity was lawful when all applicable taxes were paid and registration requirements were fulfilled. *Lauchli v. United States*, 481 F.2d 408, 411–12 (7th Cir.1973) ("these provisions were clearly directed at law-abiding persons as well as criminally suspect persons").

**13.** In contrast with Treasury's regulations prohibiting registration of the making of machineguns after 1986 for private purposes, 27 C.F.R. § 179.105, gamblers—including illegal gamblers—are allowed to register on a special form and to pay the tax. *See* 26 U.S.C. § 4412; 26 C.F.R. § 44.4412–1.

*Id.* at 42, 88 S.Ct. at 699. Illegal gamblers are allowed to register and pay the ·tax. Alleged makers of machineguns after 1986 are not.

The prosecution also relies on dictum in a footnote in *Minor v. United States,* 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969), which held that a reporting requirement by drug buyers does not violate a drug seller's privilege against self-incrimination. The prosecution, relying on a statement in the dissenting opinion (396 U.S. at 100, 90 S.Ct. at 290), claims that it was impossible to pay the drug tax in that case. The Act in question required dealers to register with the Internal Revenue Service and pay a special occupational tax, and required producers or importers to purchase stamps and affix them to the package. Registered dealers could secure order forms to transfer drugs. *Id.* at 94, 90 S.Ct. at 287. While the Court focused on the self-incrimination issue, it noted that "there were some 400,000 registered dealers under the Harrison Narcotics Act in 1967 and that registered dealers can readily get order forms issued in blank." *Id.* at 97, 90 S.Ct. at 289.

As the Court noted, a tax measure is valid even though it may deter an activity, revenue is negligible, or the activity may be illegal. 396 U.S. at 98 n. 13, 90 S.Ct. at 289 n. 13.[14] Indeed, since being passed in 1934, the National Firearms Act has imposed occupational taxes, making and transfer taxes of $200 per firearm, and stringent registration requirements. Yet these taxation requirements did not amount to a prohibition, and registration retained a tax nexus.

In any event, the interpretation of the constitutional basis of the specific statute in this case is governed by *Sonzinsky v. United States,* supra, 300 U.S. 506, 57 S.Ct. 554 and its progeny, not by dictum in a footnote in an unrelated narcotics case. *Sonzinsky* held that "the mere registration provisions ... are obviously supportable as in aid of revenue purpose." *Id.* at 513, 57 S.Ct. at 555. *Haynes v. United States,* supra, 390 U.S. at 87, 88 S.Ct. at 725, repeated that the National Firearms Act is a tax measure, and that registration is "calculated to assure [tax] collection." *Id.* at 88–89, 88 S.Ct. at 725–26. The Act was described as a tax measure again in *United States v. Freed,* 401 U.S. 601, 602–03, 91 S.Ct. 1112, 1114–15, 28 L.Ed.2d 356 (1971).

The enactment of 18 U.S.C. § 922(*o* ) in 1986 removed the constitutional legitimacy of registration as an aid to tax collection. This is because the government interprets and enforces § 922(*o*) to disallow registration, and refuses to collect the tax. *Farmer v. Higgins,* 907 F.2d 1041, 1042–44 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). Thus, § 922(*o* ) undercut the constitutional basis of registration which had been the rule since *Sonzinsky.*

Finally, the prosecution quotes an enactment passed in 1968 that the provisions of

---

**14.** In this footnote, the Court remarked that the stringent requirements *"operated to prevent"* many people from obtaining drugs (*id.* 396 U.S. at 98 n. 13, 90 S.Ct. at 289 n. 13) (emphasis added), but does not suggest that it was impossible to register as a dealer and to pay applicable taxes. Indeed, the cases cited by the court upheld the drug taxes because they could be paid, and because reporting requirements assisted in collection of the revenue. *United States v. Doremus,* 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493 (1919) ("the legislation enacted [must have] some reasonable relation to the exercise of the taxing authority conferred by the Constitution"); *Nigro v. United States,* 276 U.S. 332, 341, 48 S.Ct. 388, 390, 72 L.Ed. 600 (1928) ("in interpreting the act, we must assume that it is a taxing measure, for otherwise it would be no law at all.").

Nothing in *Minor* suggests that tax payments would not be accepted, and no registration scheme was at issue. No further jurisprudence on this statute has been forthcoming because in 1970, Congress repealed the Harrison Narcotics Act and the provisions of the Internal Revenue Code at issue in *Minor,* and enacted the Comprehensive Drug Abuse Prevention and Control Act under the constitutional power to regulate interstate commerce. P.L. 91–513, Tit. II, § 101, 84 Stat. 1242 (October 27, 1970); U.S.Code Cong. & Admin.News 1970, at 4566, 4567, 4595, 4647. As the Congressional findings codified in 21 U.S.C. § 801 state, Congress deemed it constitutional to regulate mere transfer and possession of drugs only because they were found to have a substantial and direct effect on interstate commerce.

Title I of the Gun Control Act shall not modify or affect the National Firearms Act.[15] However, the 1968 Congress cannot bind the Congress of 1986, which decided to ban transfer and possession of machineguns. P.L. 99–308, 100 Stat. 453 (May 19, 1986).[16] Further, a Congressional declaration in 1968 does not solve a constitutional problem which arose in 1986. The ban enacted in 1986, and the government's refusal to accept registrations and tax payments, simply left the registration requirements with no constitutional basis. It is the duty of the judiciary to declare such laws unconstitutional. *Marbury v. Madison*, 1 Cranch. 137, 176–77, 2 L.Ed. 60 (1803).

In sum, since enactment of 18 U.S.C. § 922(*o*), the Secretary has refused to accept any tax payments to make or transfer a machinegun made after May 19, 1986, to approve any such making or transfer, or to register any such machinegun. As applied to machineguns made and possessed after May 19, 1986, the registration and other requirements of the National Firearms Act, Chapter 53 of the Internal Revenue Code, no longer serve any revenue purpose, and are impliedly repealed or are unconstitutional. Accordingly, Counts 1(a) and (b), 2, and 3 of the superseding indictment are DISMISSED.

---

**15.** Section 104 of the Gun Control Act of 1968, P.L. 90–618, 82 Stat. 1226, states: "Nothing in this title or the amendment made thereby shall be construed as modifying or affecting any provision of (a) of the National Firearms Act (Chapter 53 of the Internal Revenue Code of 1954)...."

**16.** Indeed, § 109(b), P.L. 99–308, 100 Stat. 460, created a Title I provision, which modified or affected a provision of the NFA. Clearly, the 1986 Congress did not feel bound by the 1968 declaration.