INDIANA PORT COMMISSION,
Plaintiff–Appellant,

v.

BETHLEHEM STEEL CORPORATION
and Lake Carriers' Association,
Defendants–Appellees.

No. 87–1290.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 26, 1987.

Decided Dec. 23, 1987.

Rehearing and Rehearing En Banc
Denied Feb. 3, 1988.

Steven M. Schneebaum, Patton Boggs & Blow, Washington, D.C., for plaintiff-appellant.

Jerry P. Belknap, Barnes & Thornburg, Indianapolis, Ind., J.B. Smith, Beckman, Kelly and Smith, Hammond, Ind., for defendants-appellees.

Before BAUER, Chief Judge, WOOD and MANION, Circuit Judges.

BAUER, Chief Judge.

The appellant, Indiana Port Commission ("IPC"), charges a general fee, known as the "Harbor Service Charge" (the "HSC"), on vessels using the Burns Waterway Harbor (the "Harbor"). The IPC billed the Bethlehem Steel Corporation ("Bethlehem") and members of the Lake Carriers' Association (the "Carriers") for fees owed under the HSC. The appellees, Bethlehem and Carriers, refused to pay this fee and, as a defense to the IPC's action for debt collection, alleged that the HSC is invalid. The district court agreed and we affirm.

## I.

### District Court Findings of Fact

This case, before us for the second time, has a lengthy historical and factual background, *see Indiana Port Comm'n v. Bethlehem Steel Corp.*, 702 F.2d 107, 108–09 (7th Cir.1983), which bears repeating.

In 1961, the Indiana state legislature created the Indiana Port Commission for the purpose of promoting "the agricultural, industrial and commercial development of the state, and to provide for the general welfare" by the construction and operation of various port facilities, including "a modern port on Lake Michigan." Ind.Code Ann. § 8–10–1 *et seq.* (Burns 1973). To carry out its legislative mandate, the IPC decided to construct a port and public terminal, the Harbor, on Lake Michigan near Portage, Indiana. In mid–1962, the IPC, Bethlehem, and the Midwest division of National Steel Corporation ("National") entered into an agreement to construct the new Harbor adjacent to parcels of land already owned by Bethlehem and National. Under the terms of the agreement, the IPC: (1) purchased some land from Bethlehem; (2) granted Bethlehem riparian rights on the lake; (3) waived in perpetuity the IPC's right to condemn Bethlehem's land; and (4) agreed to allow Bethlehem's vessels access to the waters of the outer harbor under the same conditions as all other vessels making use of the Harbor. In exchange, Bethlehem agreed, *inter alia*, to construct part of the Harbor entrance, the bulkhead at the

east end (the Bethlehem side) of the Harbor, the east deflector wall, and riparian enclosure walls. National also agreed to build a bulkhead on its property (the west end).

In late 1969, the federal government agreed to reimburse the IPC for certain of its expenditures on the Harbor. The agreement also provided that the Chief of Engineers of the Army Corp of Engineers would supervise the work paid for by these reimbursed funds, and that, upon completion, the federal government would accept a portion of the project as part of an authorized Federal Project and pay for maintenance and repair expenses for that portion. Pursuant to this agreement, the State of Indiana granted the federal government a deed covering the land around the outer breakwaters of the Harbor and a perpetual right-of-way easement for the use of the outer Harbor.

The IPC spent approximately $25 million on land and construction for the Harbor. The Indiana General Assembly appropriated this money with an express proviso that the IPC was not required to reimburse the state for the money. The United States government, through the Army Corps of Engineers, reimbursed the IPC for approximately $13 million of these expenditures, pursuant to the 1969 agreement.

The Harbor opened in 1970. The IPC established a schedule of fees for the use of the Harbor, including the general-usage HSC. The HSC was intended to defray part of the expense of administration and maintenance of the Harbor. The IPC immediately began to bill Bethlehem and National, as well as other users of the public port, the HSC for all vessels calling at these facilities. Bethlehem and National strenuously objected to the imposition of the HSC upon the ships using their private docking facilities, arguing that the ships calling at their docks used only the federally owned portion of the Harbor, not the IPC facilities. The IPC, unconvinced by this argument, has been engaged in litiga-tion since July, 1971, to collect the unpaid HSC.

The IPC originally filed this action in Indiana state court in July, 1971. After the case was removed to the United States District Court for the Northern District of Indiana in late 1971, proceedings were held up pending the outcome of a challenge to the HSC initiated by Bethlehem before the Federal Maritime Commission ("the Commission"). After nine years of hearings before, and decisions by, the Administrative Law Judge of the Commission, the Commission, and the United States Court of Appeals for the District of Columbia Circuit, the Commission dismissed the proceedings for lack of jurisdiction. The IPC then filed an amended complaint in the Northern District of Indiana in October 1980. Chief Judge Sharp then bifurcated the proceedings into a liability phase and a quantum phase. After receiving motions for summary judgment from both Bethlehem and the IPC on April 1, 1981, the district court granted the IPC's motion and entered judgment for it on all liability issues on April 14, 1981. The district court, on February 24, 1982, entered a final judgment awarding $327,258.82 to the IPC. On appeal, we reversed the grant of summary judgment and remanded the case. *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 702 F.2d 107.

In December, 1986, Judge Moody held a bench trial and entered judgment in favor of Bethlehem and the Carriers. Specifically, the district court held, *inter alia*, that the HSC violates the constitutional prohibition on "duties of tonnage," U.S. Const. art. I, § 10, ch. 3, and the Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5, which prohibits the collection of tolls or charges from vessels passing through navigational waters constructed or acquired by the United States, 653 F.Supp. 604. The IPC challenges these two district court holdings on this appeal.[1] We affirm on the basis that the HSC violated 33

---

1. In addition, IPC asks this court to consider the permissibility of assessing the HSC against Bethlehem for all vessels calling at its facility. Be-cause of our disposition of the case, we need not decide this issue.

U.S.C. § 5 and therefore do not reach the constitutional question.

## II.

 We avoid deciding constitutional questions if the case may be disposed of on other grounds presented. "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the court will decide only the latter." *Ashwander v. Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (Brandeis, J., concurring); *Vickers v. Quern*, 578 F.2d 685, 688 (7th Cir. 1978); *Meredith Corp. v. F.C.C.*, 809 F.2d 863, 870 (D.C.Cir.1987); *Thigpen v. Smith*, 792 F.2d 1507, 1514 n. 12 (11th Cir.1986). The district court struck down the HSC because it violated both the Constitution and a federal statute. Because we find that the HSC violates 33 U.S.C. § 5, it is unnecessary to resolve the constitutional question and we decline to do so.

## III.

 Section 5 of the Rivers and Harbors Appropriation Act of 1884 states in pertinent part:

> No tolls or operating charges whatever shall be levied upon or collected from any vessel, dredge, or other water craft for passing through any lock, canal, canalized river, or other work for the use and benefit of navigation, now belonging to the United States or that may be hereafter acquired or constructed....

The limited legislative history suggests one purpose of this provision is to maintain free navigation for public use of the federal waterways. H.R.Rep. No. 1554, 48th Cong., 1st Sess. 6 (1884).

The IPC argues that the statute is a federal appropriations act, not a prohibition against states charging fees or tolls, and therefore, does not apply to this case. Even if we agree with IPC that Section 5 "is essentially a maintenance provision,"

*Atchison, Topeka & Santa Fe Ry. v. Callaway*, 382 F.Supp. 610, 616 (D.D.C.1974), we cannot ignore the plain and precise language of the statute. The language of Section 5 is unambiguous. "No tolls" or "charges" can be collected from "any vessel" for "passing through" any "work for the use and benefit of navigation" that belonged to the United States at the time of the enactment of the statute or that the United States later "acquired" or "constructed." The text of the statute does not exclude states or private parties from this prohibition. Rather, it clearly says that *no* tolls can be charged on *any* vessels. "If the plain language of the statute is clear, we do not look beyond those words to interpret the statute." *Kelly v. Wauconda Park Dist.*, 801 F.2d 269, 270 (7th Cir.1986) (citation omitted). The statute's limited legislative history, nevertheless, seems to confirm this conclusion. The purpose of the prohibition on tolls was to ensure free navigation. H.R.Rep. No. 1554, 48th Cong., 1st Sess. 6 (1884). This necessitates a reading of Section 5 that prevents states from doing what the federal government cannot do. To read Section 5 to allow states to levy tolls and charges on vessels travelling through federal waterways would undermine the purpose of the statute. Therefore, we hold that Section 5 does apply to the states.

Having decided this threshold question, we now must determine whether the Harbor falls under the reach of this statute. Since the Harbor was not constructed until well after the enactment of Section 5, the statute prohibits the IPC's charge only if the Harbor was "acquired" or "constructed" by the United States.

 The district court, after a bench trial, concluded that the Harbor belonged to the United States.[2] The court's finding rested on the fact that: (1) the federal government contributed a substantial portion of money to the construction of the Harbor; (2) the State of Indiana agreed that the Harbor would become a federal

---

**2.** In contrast, the district court found that the public terminal facility belonged to the State of Indiana.

project when the federal government certified its completion; (3) the federal government has the right of real and beneficial uses of the Harbor; and (4) the federal government was responsible for repair and maintenance of the Harbor. Specifically, the district court found that the United States reimbursed the State of Indiana "for nearly all of the costs of the Harbor." The district court also found that

"[a]lthough the State of Indiana retained the bare legal title to the bed underlying the Harbor, the real and beneficial uses of the Harbor belong to the federal government, which has the fee simple deed to the land around the outer breakwaters, perpetual right-of-way easement for the use of the outer Harbor, and responsibility for regulation and supervision of the Harbor."

We cannot say that these findings are clearly erroneous and therefore affirm the district court's holding.

According to the IPC, " 'to acquire' " generally means "to obtain possession and/or title." As the district court found, the combination of the federal government's perpetual easement for the use of the outer Harbor and its agreement with the State of Indiana to create an authorized federal project demonstrate that the United States has possession and control of the Harbor, if not actual legal title to it. That the district court found that the Harbor "belongs to" the United States, rather than finding that it was "acquired by" the United States is a distinction without a difference. The Harbor could not belong to the United States unless the government had somehow acquired it or gained possession or control of it.[3] The district court's conclusion that the Harbor "belonged to" the United States, therefore, brings this under the "acquired by" language of Section 5.

### IV.

The consequences of the result we reach today were not unanticipated by the Indiana legislature. In its determined effort to achieve reimbursement from the federal government, the State of Indiana agreed to grant certain control of the Harbor and authority to the United States and did so willingly. The Indiana legislature also decided to undertake the project knowing that it might not receive full reimbursement from the federal government. In fact, the legislature expressly chose not to require the IPC to reimburse the state for expenditures authorized and spent on the project. Furthermore, our holding does not undermine the authority of the IPC to raise future revenues from charges for the use of its public terminal facility in order to pay for its improvements.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

3. The district court's finding that the Harbor "belongs" to the United States is also consistent with the request of the parties agreed to in the Pre–Trial Order.