**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ralph R. ROSS, Defendant–Appellant.**

No. 92–3774.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1993.

Decided Nov. 5, 1993.

Sheila Finnegan, Asst. U.S. Atty., Crim. Div., Chicago, IL (argued), for plaintiff-appellee.

Chris Averkiou, Chicago, IL (argued), for defendant-appellant.

Before POSNER, Chief Judge, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Ralph Ross was convicted of illegal possession of an unregistered firearm and illegal possession of explosives. After Mr. Ross served a three-year prison term he was released on supervised release and on probation. Subsequently, the government filed a motion alleging that Mr. Ross had violated several conditions of his release and requesting that he be required to show cause why his supervised release and probation should not be revoked. After a revocation hearing was held on the matter, the district court revoked his supervised release and his probation. Mr. Ross now challenges the revocation of his supervised release and his probation and also contests his initial conviction. We reverse the revocation of probation. In all other regards, the judgment of the district court is affirmed.

## I

### BACKGROUND

In January 1989, Mr. Ross was charged in a two-count indictment. Count I charged the possession of an unregistered machinegun on November 4, 1987, in violation of 26 U.S.C. § 5861(d), which prohibits the possession of certain unregistered firearms. The firearm in question was a 1915 World War I antique. According to Mr. Ross, the weapon was technically a "Deactivated War Trophy" (DE-WAT) because the barrel on the weapon was plugged and the receiver tube was fused to

the firing pin, thus preventing the automatic firing of more than one round of ammunition with a single pull of the trigger. Prior to May 1986, when the Firearms Owners' Protection Act ("1986 Act") was enacted, the weapon apparently was not considered a machinegun at all and thus was not subject to the registration requirements of § 5861(d). *See United States v. Ross,* 917 F.2d 997, 998 (7th Cir.1990) (per curiam), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991). However, the 1986 Act made illegal possession of all machineguns not owned and properly registered before the Act took effect, and broadened the statutory definition of machinegun to include particular parts as well as the entire weapon. *See* 18 U.S.C. § 922(*o*) (1988); *United States v. Jones,* 976 F.2d 176, 183 (4th Cir.1992) ("amendment to the Gun Control Act effectively rendered possession of certain guns automatic violations of both the Gun Control Act and the National Firearms Act"), *cert. denied,* — U.S. ——, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993). Accordingly, upon the effective date of the 1986 Act, Mr. Ross' weapon became subject to the registration strictures of § 5861(d). It is undisputed that Mr. Ross has never registered the weapon in accordance with the provisions of § 5861(d). Count II charged the storage of explosives in violation of 18 U.S.C. § 842(j). On August 7, 1989, Mr. Ross pled guilty to Count II and on August 9 a jury convicted him on the charges alleged in Count I.

Mr. Ross was sentenced by the court on December 29, 1989. On Count I, the district court sentenced Mr. Ross to thirty-six months' incarceration, to be followed by three years of supervised release.[1] On Count II, the court suspended sentence and imposed a five-year term of probation. The court did not specify whether this probationary period under Count II was to run concurrently or consecutively to the sentence imposed under Count I. Special conditions of Mr. Ross' supervised release and probation required that: (1) he was not to have any contact with firearms; (2) he was to partici-

pate in a psychiatric counselling program; and (3) he was to report to the probation officer as directed and answer truthfully all inquiries by the probation officer, including financial inquiries. In 1990, on direct appeal, this court affirmed Mr. Ross' conviction.

On March 19, 1992, after serving the full three-year prison term for Count I, Mr. Ross was released from custody. On April 13, 1992, the district court issued a minute order stating that the period of probation under Count II was to run consecutively to the period of incarceration, and concurrently with the period of supervised release, imposed under Count I.[2]

On June 22, 1992, Mr. Ross' probation officer issued a report alleging that Mr. Ross had violated his probation because: (1) he was unemployed; (2) he was not receiving psychiatric treatment; (3) he had not made any payments toward his fine and various court assessments; (4) he refused to fill out a financial questionnaire; and (5) he failed to sign his monthly probation reports attesting that the information was complete and truthful. Consequently, the government filed a motion for an order to show cause why Mr. Ross' probation should not be revoked.

On August 18, 1992, a hearing was held on the motion. Prior to his conviction, Mr. Ross legally had possessed a private collection of over fifty guns. However, because one of the conditions of his probation was that he not have any contact with firearms, the court inquired, during the August 18 hearing, what he had done with his gun collection. Mr. Ross responded that he had sold the guns. However, asserting his Fifth Amendment right not to incriminate himself, he refused to reveal, absent a grant of immunity, to whom he had sold the collection. The court refused to grant official immunity; however, it made very clear to Mr. Ross and his attorney that, if Mr. Ross did not satisfy the court that the guns were no longer in his

---

1. The district court also imposed a fine of $5,000 on Count I and ordered Mr. Ross to reimburse the Federal Defender Program for the costs of his representation.

2. The record is not clear as to whether this court order was issued sua sponte or in response to the government's request. *See* R. 68.

possession, his probation would be revoked.[3] Mr. Ross stated that he understood the gravity of the situation, and the court instructed him to file a written response to the government's motion and the probation report.

On Oct. 8, 1992, in his written response to the government's motion, Mr. Ross submitted that the district court could not revoke his probation and supervised release for refusing to answer questions asked by the probation officer or by the court because he expressly had based his refusal on an invocation of his Fifth Amendment rights. Additionally, Mr. Ross argued, for the first time, that the court had no jurisdiction to modify his sentence on April 13, 1992, when it issued the minute order stating that his probation on Count II was to run consecutively to his prison sentence for Count I. Specifically, he argued that Criminal Rule of Procedure 35(c) provides that a sentencing court has only seven days to amend sentencing orders.

On October 20, the district court held a second probation revocation hearing and rejected Mr. Ross' arguments. The court stated that it had not amended the sentence, but merely specified when the period of probation was to start. The court again explicitly told Mr. Ross that, if he did not reveal to the court the location of his gun collection, his probation would be revoked. Mr. Ross again refused to answer absent an express grant of immunity from the court.[4] The court told Mr. Ross that, under the law, the effect of the court compelling an answer was to give him immunity.[5] Nevertheless, Mr. Ross refused to answer without a formal grant of immunity.

During this same October 20 hearing, the court also found that Mr. Ross had lied to his probation officer and had missed two or three scheduled appointments and that there was therefore a reason to revoke his probation separate and independent from failure to reveal the whereabouts of his gun collection. Specifically, after an exchange with Mr. Ross about missed appointments with his probation officer and whether he had access to a car and car insurance, the court concluded that his lack of candor with both his probation officer and the court was "a separate and independent basis for revoking his probation." Tr. of Oct. 20, 1992 at 12.

> We cannot supervise people who obviously, it seems to me, lie to the probation officer and do not keep appointments that are scheduled. I mean, that is the fundamental basis for the probation supervision; that the defendant keep in contact with his probation officer when reasonably requested to do so. And all I get is a lot of malarkey here about car/no car/it's in the driveway/it's not mine, it's somebody else's/he's driving it.
>
> There is ever[y] reason to think that he does have a car at his disposal. I credit [the probation officer's testimony]—he has done some homework here. He found out the circumstance about the car and he has it on a good authority that Mr. Ross does have a car at his disposal; and, in fact, does drive a car and was seen in it and, I guess, . . . stopped.

*Id.*

At the conclusion of the hearing, the court revoked Mr. Ross' probation under Count II, imposed a one-year sentence and ordered

---

3. Specifically, the court stated:

> This is a lawfully-imposed condition and unless I am satisfied that that condition has been satisfied, he is looking at revocation of his supervised release.
> So, you can claim the Fifth to your heart's content but I am telling you that the effect of that is to take the absence of some affirmative statement—that he does not have those guns anymore—as being an answer, if you will, with negative implications for him. So, I will tell you that. All right?
>
> . . . . .
>
> I am not giving him immunity for anything. I am just telling you, and I am not going to play

games with you, unless I am satisfied that he does not have those guns anymore—all right?—I am going to revoke his supervised release and you can sit on your Fifth Amendment all you want. It is not going to protect him from complying with the conditions of supervised release.

Tr. of Aug. 18, 1992 at 10–11.

4. Mr. Ross also refused to submit financial information, again asserting his Fifth Amendment right.

5. The government had referred the court and Mr. Ross to *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

him taken into immediate custody. Additionally, the court revoked Mr. Ross' supervised release under Count I; however, the court deferred sentencing on that count until November 12 in order to allow the parties to brief the issue.

In response, Mr. Ross filed a Motion to Vacate Sentence, attacking the underlying conviction and asking the court to vacate his original 1989 sentence. In this motion to vacate, Mr. Ross claimed, for the first time, that the statute under which he was convicted, § 5861(d) (possession of unregistered machine gun), was effectively repealed before his conviction, thus rendering his conviction unconstitutional. Specifically, Mr. Ross contended that § 5861(d) was repealed on May 19, 1986, eighteen months prior to the date he was charged, by § 102(9) of the Firearms Owners' Protection Act. 18 U.S.C. § 922(*o*) (1988). Mr. Ross also argued, for the first time, that under § 3561 the court could not impose both a period of incarceration under Count I and a period of probation under Count II. Finally, Mr. Ross argued that the district court erred during his initial trial when it instructed the jury that there was no knowledge element for possession of an unregistered machinegun. The government, submitted Mr. Ross, should have been required to prove that he knew the gun was a machinegun, that is, had the capacity to fire more than one round of ammunition automatically with a single pull of the trigger, and not just any firearm.

On November 12, the district court held its third and final hearing on Mr. Ross' revocation. The court concluded that the only issue properly before it on November 12 was the appropriate sanction for Mr. Ross' alleged probation and supervised release violations. The district court expressed the view that it did not have jurisdiction to consider Mr. Ross' challenge to the constitutionality of his conviction. The court opined that the proper vehicle for such post-conviction relief was to file a petition for a writ of habeas corpus. Tr. of Nov. 12, 1992 at 6. Nevertheless, after pronouncing that it had no jurisdiction and would not reach the merits, the district court went on to reject Mr. Ross' substantive arguments that his underlying conviction should be vacated.

The district court next offered Mr. Ross a final opportunity to comply with its information requests concerning the whereabouts of his gun collection and his financial statements. However, Mr. Ross again refused and reasserted the Fifth Amendment privilege against self-incrimination. Accordingly, the court imposed a term of one year of incarceration for Count I, to be served concurrently with the one-year period Mr. Ross was already serving for Count II. The court reasoned that no additional time should be served for the revocation of supervised release under Count I because the basis for the probation and supervised release revocations was the same.

## II

## ANALYSIS

The appellant presents many issues. As we have just noted, the district court addressed these matters over several months in a series of hearings. To facilitate our presentation and the reader's comprehension, we believe it is best that we track, as closely as possible, the chronological development of these matters in the district court.

### 1.

■ We turn first to the district court's revocation of Mr. Ross' probation on Count II. As we have noted earlier, the district court, at the time of the original sentencing, imposed a sentence on Count I that consisted, in pertinent part, of thirty-six months' incarceration, to be followed by three years of supervised release. At the same time, the district court entered the following sentence with respect to Count II: "The imposition of sentence on Count 2 is suspended and the defendant will be sentenced to probation on Count 2." R. 68 at 2. With respect to the period of probation, the court entered in the order that "[t]he defendant is hereby placed on probation for a period of FIVE (5) years." *Id.* at 4.

As the government acknowledges in its brief, such a sentence is not permitted by the

statute. Title 18 U.S.C. § 3561(a)(3) (1988) provides:

> If the Court imposes a sentence of imprisonment on any count of the indictment, it must sentence the defendant to a term of imprisonment on each of the remaining counts. The Court may not sentence the defendant to mixed sentences on various counts involving imprisonment and probation. The sentences of imprisonment on the various counts must conform to the requirements of the USSG and will run concurrently unless the Court expressly orders that they are to run consecutive.

The sentence imposed by the district court at the time of the initial sentencing was therefore not one that could have been imposed under the applicable statute.

After the defendant had served the entire sentence of incarceration imposed on Count I and was serving the period of supervised release also imposed on that count, the district court entered an order on April 13, 1992, that read, in pertinent part:

> The defendant's sentence is hereby modified to reflect that the sentence of probation on Count 2 is to run consecutively to the period of incarceration on Count 1, and currently with the sentence if [sic] supervised released on Count 1. Remainder of defendant's sentence to stand as previously imposed.

R. 93. Mr. Ross submits that the district court lacked jurisdiction to make this modification twenty-eight months after his initial sentencing date. In response, the government asserts that the court was not amending, but merely clarifying, the original sentence. *See* Appellee's Br. at 39.

The authority of the district court to correct an illegal sentence is now circumscribed by the terms of Federal Rule of Criminal Procedure 35(c). That section now provides:

> The court, acting within 7 days after the imposition of sentence, may correct a sentence that was imposed as a result of

arithmetical, technical, or other clear error.

This new version of the Rule adapts the earlier scheme to the demands of the sentencing guidelines structure while preserving, albeit on a very constricted scale, the former authority of the district court, grounded in rule and, at least prior to the rules, inherent power, to correct errors in sentences. *See* Fed.R.Crim.P. 35(c) advisory committee's note.

Accordingly, we must conclude that the district court's imposition of a sentence not authorized by law on Count II could not be remedied effectively by the order issued twenty-eight months after the imposition of the sentence and after the sentence to incarceration on the companion count had been served.[6] Therefore, the district court's revocation of probation under Count I was not effective and the district court's judgment in that regard must be reversed.

### 2.

■ We now turn to the question of whether the district court validly revoked the period of supervised release on Count I. Mr. Ross submits that the court improperly revoked his supervised release because he refused to answer the court's inquiries about the disposition of his gun collection and his finances on the ground of his Fifth Amendment right against self-incrimination.

The government first responds by suggesting that, on the record before us, we need not reach this issue. In its view, the district court stated that it was revoking his probation for three reasons, including the independent ground that Mr. Ross had lied to his probation officer and had missed scheduled appointments. Moreover, submits the government, even had the court revoked Mr. Ross' probation for the sole reason that he refused to reveal the present locale of the gun collection, his Fifth Amendment claim is without merit. In support of its assertion,

---

**6.** In its brief, the government contends, without citation of authority, that the defendant waived this argument by not objecting to the sentencing orders upon their entry or on direct appeal. The error of the district court, however, worked to the detriment of the government rather than to the defendant and we note that the government made no attempt to ensure that the rights it now asserts were protected. The defendant, on the other hand, did object when the illegal sentence of probation was revoked to his detriment.

the government asks us to adopt the rationale of the Second Circuit in *Asherman v. Meachum*, 957 F.2d 978 (2d Cir.1992) (en banc).

█ We turn first to the government's suggestion that the revocation of the supervised release can be justified on the ground that Mr. Ross failed to meet with his probation officer and lied to the court. We have no doubt that this ground could be an adequate basis for the court's action. We also note that the record does make it very clear that Mr. Ross was uncooperative and evasive about several topics during each of the three hearings conducted by the district court. Indeed, as we have noted earlier, at one point in the protracted and unstructured proceedings, the district court expressly stated on the record that Mr. Ross' unresponsiveness concerning his access to a car and failure to appear at several scheduled appointments with his probation officer provided an independent and adequate reason for the revocation. Nevertheless, when the record is evaluated as a whole, there is a substantial doubt that, in the final analysis, the district court regarded Mr. Ross' failure to report to his probation officer and his untruths to the court to be an independent and adequate ground for the revocation of his supervised release. During the November 12 hearing, the court appeared to narrow the controlling concern to Mr. Ross' refusal to provide information on the whereabouts of the gun collection and on his financial situation, information that he refused to provide on the basis of the Fifth Amendment guarantee against self-incrimination. Accordingly, we believe that we must address that issue.[7]

The situation before us is very similar analytically to the one that confronted our colleagues in the Second Circuit in *Asherman v. Meachum*, 957 F.2d 978 (2d Cir.1992)

(en banc). In that case, the state department of corrections refused to allow a sentenced prisoner to continue on home release after it was informed that the prisoner would refuse to answer questions about the underlying offense at a scheduled psychiatric evaluation. The court recognized that, in a series of cases, the Supreme Court, although not addressing this precise situation, had set forth, in a series of decisions, significant guideposts. The Second Circuit recognized that, as a general rule, "a person cannot be compelled to be a witness against himself in a criminal proceeding nor forced 'to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Id.* at 981 (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973)). Therefore, continued the Second Circuit, the prisoner could not have been ordered to answer the questions under the pain of contempt. Nor could he have been required to waive the self-incrimination privilege. *Id.* (citing *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968)). Nor, continued the Second Circuit, could he have been punished because he invoked the privilege against self-incrimination. *See Slochower v. Board of Higher Educ.*, 350 U.S. 551, 558–59, 76 S.Ct. 637, 641, 100 L.Ed. 692 (1956) (holding that city may not discharge a teacher because the teacher invoked the Fifth Amendment before a congressional committee).

Nevertheless, held the Second Circuit, there are circumstances in which adverse actions may be taken upon a person's refusal, on Fifth Amendment grounds, to answer questions pertinent to the exercise of state authority. In support of that assertion, Judge Newman, writing for the en banc

---

7. Our concurring colleague is of the view that we may rely on this ground because, as a general rule, an appellate court may affirm on any ground supported by the record. We do not believe, however, that this general principle can be applied so easily here. Whether to terminate or modify Mr. Ross' supervised release on the basis of his having lied to his probation officer and his having missed scheduled appointments was committed to the discretion of the district court. *See* 18 U.S.C. § 3583(e); *United States v.*

*McGee*, 981 F.2d 271, 273 (7th Cir.1992). As we have noted in the text, it is not at all clear that, in the final analysis, the district court believed that this ground, standing alone, warranted the revocation of the supervised release. Accordingly, we cannot say, therefore, that such an action is before us. Certainly, we have no authority to revoke supervised release on a ground deemed inadequate (as it may have been) by the district court.

court, noted that, in *Gardner*, which held unconstitutional the discharge of a police officer, the Supreme Court carefully noted that he had been discharged " 'not for failure to answer relevant questions about his official duties, but for a refusal to waive a constitutional right.' " *Asherman*, 957 F.2d at 982 (quoting *Gardner*, 392 U.S. at 278, 88 S.Ct. at 1916). He also noted that, in *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), the workers " 'were discharged not merely for refusal to account for their conduct as employees of the city. They were dismissed for invoking and refusing to waive their constitutional right against self-incrimination.' " *Asherman*, 957 F.2d at 982 (quoting *Sanitation Men*, 392 U.S. at 283, 88 S.Ct. at 1919). On the basis of these cases, Judge Newman concluded:

> What clearly emerges from these decisions is both a limit and a grant of power with respect to governmental inquiries. Public agencies may not impair the privilege against self-incrimination by compelling incriminating answers, or by requiring a waiver of immunity, or even by asking incriminating questions in conjunction with an explicit threat to use the answers in criminal proceedings. But public agencies retain the authority to ask questions relevant to their public responsibilities and to take adverse action against those whose refusal to answer impedes the discharge of those responsibilities. The fact that a public employee might face the unpleasant choice of surrendering his silence or losing his job is no bar to an adverse consequence so long as the consequence is imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right. The Supreme Court left public employees facing this choice without ruling definitively as to the effect of the choice upon governmental use of any responses the employee elected to give. *See Gardner*, 392 U.S. at 278–79, 88 S.Ct. at 1916–17; *Sanitation Men*, *id.* at 284, 88 S.Ct. at 1919–20.

Applying the teaching of these decisions to Asherman's case, we conclude that the Commissioner was entitled to revoke Asherman's SHR status for his refusal to discuss his crime. The inquiry was relevant to the Commissioner's public responsibilities. He was entitled to conduct periodic reviews of Asherman's suitability for home release, and he was entitled to assess the impact of parole denial upon Asherman's mental health. Asherman's attempt to foreclose all questions about his crime prevented the Commissioner from pursuing a relevant inquiry. In pursuing the inquiry, the Commissioner took no action to impair Asherman's self-incrimination privilege. He sought no court order compelling answers, he did not require a waiver of immunity, and he did not insist that Asherman's answers could be used against him in a criminal proceeding. He stayed well within the authority outlined by *Gardner* and *Sanitation Men* by conducting a relevant inquiry and then taking appropriate adverse action, not for Asherman's invocation of his constitutional rights, but for his failure to answer a relevant inquiry. In Justice Harlan's terms, just as public officials may be discharged and lawyers disciplined "for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices," *Sanitation Men*, 392 U.S. at 285, 88 S.Ct. at 1920, a prisoner may be terminated from home release status for refusing to divulge to a corrections commissioner information pertinent to the administration of a home release program.

957 F.2d at 982–83.

In addressing whether the district court's revocation of the period of supervised release violated Mr. Ross' right against self-incrimination, we think it advisable, at the outset, to sharpen the focus of the issue before us by stating with some precision what the record shows and what it does not show. First of all, it is manifestly clear that the district court made the inquiries it did for one reason—to ensure that the legitimate conditions of parole that it had previously imposed were being met. There is not the whisper of an echo in this record to suggest that the district court had an interest in ferreting out incriminating admissions to facilitate the further prosecution of the defendant. Indeed, the court mentioned several

times that it was very reluctant to visit any further incarceration on Mr. Ross. It is also important to note that the record simply will not support a suggestion that the district court revoked the supervised release because Mr. Ross invoked the protections of the Fifth Amendment. It is very clear that the court's sole concern was that it obtain information that it considered, with ample justification, to be necessary to the fulfillment of its responsibilities in monitoring the period of supervised release. Therefore, like the Second Circuit, we are confronted with a situation in which a court takes adverse action in a response to a refusal to answer questions under circumstances in which the answers might tend to incriminate but are also very relevant to a legitimate informational need of the court. We believe that the district court correctly concluded that, in the absence of the information necessary to determine whether Mr. Ross was living up to the conditions of his supervised release, it was permissible for the district court, and indeed its responsibility, to revoke his supervised release.[8] Mr. Ross has correctly asserted that, during a probation hearing, a probationer clearly has a right to invoke his Fifth Amendment privilege. *See Minnesota v. Murphy,* 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984). Nevertheless, we cannot accept that he has an additional right to avoid the express conditions upon which he was granted probation, or, in this case, supervised release. He must make a choice. If he is to enjoy the advantages of supervised release, Mr. Ross must comply with any lawfully imposed conditions of probation. Indeed, we find Mr. Ross' arguments particularly untenable given how directly related the district court's questions were to his initial offense and to the explicit probation condition that he not have any contact with firearms.

3.

■ The last hearing on the revocation of the supervised release was, by any fair reading of the record, to be limited to the issue of the sentencing alternatives available to the district court upon the revocation of the supervised release. Nevertheless, on the day of the hearing, counsel for Mr. Ross filed a document that purported to be a motion for the vacation of the sentence. Counsel argued that it conformed to the requirements of 28 U.S.C. § 2255. It challenged, among other things, the validity of the original conviction on the ground that Mr. Ross had been convicted under a statute that had been repealed prior to Mr. Ross' conviction. After ascertaining that counsel for the government had only a brief opportunity to study the document, the district court expressed the view that the document submitted by counsel ought not be considered at the hearing in progress but ought to proceed as a separate action.

> THE COURT: Well, I am inclined to think the following. Mr. Averkiou, you are attacking the underlying conviction in the first instance by your papers, I take it?
>
> MR. AVERKIOU: On the basis of jurisdiction.
>
> THE COURT: I think you have to do that either by a writ of habeas corpus or the statutory substitute therefore. The only issue before me today is the appropriate punishment or sanction for the conditions of supervised release, which I have already determined. So, I will deny the motion on the basis that it is inappropriate and you can raise it in another way.

Tr. of Nov. 12 at 6. Counsel for the defendant then said that he "would like to have that issue raised in the Court of Appeals" and noted that he believed that his motion qualified as a motion for relief under 28 U.S.C. § 2255. *Id.* at 7.

The court then opined in a brief sentence on the merits of the case:

> I find it difficult to accept as a proposition that any later action by a legislature vitiates and vacates a prior criminal statute

---

**8.** *See also United States v. Pierce,* 561 F.2d 735, 742 (9th Cir.1977) (noting that a defendant who asserted his Fifth Amendment right to silence in refusing to answer questions regarding his finances that related to condition of his probation "failed to show that the conditions infringed upon his constitutional rights [and failed to] ... provide[ ] any other justification for his refusal to comply with the condition of probation"), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 516 (1978).

that was appropriate in the first instance, that was constitutionally valid in the first instance, and I think that is a good part of your argument.

*Id.* at 7. It then continued immediately:

> But I think that I will not entertain it; and, beyond that, I will deny it on the basis that whatever the legislature did thereafter, which is, I think, part of your argument, I think you argue that the statute he was convicted under was a revenue raising statute and some later enactment by Congress changed the character of that kind of control over firearms? Is that the gist of your argument?

*Id.* Counsel for the defendant proceeded to give a brief additional explanation of his position on the merits and the court then asked if the issue raised in this motion had been raised before. Counsel took the position that the caselaw supporting his position "had evolved" in 1991 and 1992 and this was the first instance since then when Mr. Ross had been subject to additional sanctions. The court expressed disagreement with the latter statement and then terminated the discussion by saying: "But in any event, I am going to deny your motion and you can take it to the Court of Appeals." *Id.* at 8. The written minute order merely recites that all motions are denied.

We believe that, when the record is evaluated as a whole, the action of the district court can best be characterized as a ruling that the presentation of the motion to vacate sentence at the November 12 hearing was out of order because it was beyond the scope of the hearing. This characterization is particularly appropriate when we remember that the motion was filed the same day, opposing counsel had only a brief opportunity to review it, and the district court itself confessed to having "looked at [the] motion somewhat, although not extensively." *Id.* at 7. As far as we can ascertain, counsel for the government never had the opportunity to address whether the argument raised in the motion ought to be deemed waived because it had not been raised on direct appeal. We believe that it strains credulity beyond all reason to conclude that the district court made the primary basis of its decision a ruling on the merits after such a preemptory procedure.

We believe that the district court acted well within its discretion in determining that the motion filed by defense counsel was out of order at that day's hearing. The issues presented were complex constitutional ones that required ample time for reply by the government. Moreover, there was also a serious issue of waiver that the government had a right to address. There was no abuse of discretion on the part of the district court.

### 4.

■ We have determined in the immediately preceding section that the district court did not intend to address, in a definitive way, the merits of the § 2255 petition interjected into the supervised release revocation proceedings at the last minute. Nevertheless, to cover the contingency that we have misread the record in that regard, we address the merits. An issue of law is presented and it has been addressed by the parties.

Title 26 U.S.C. § 5861 requires private citizens to register their ownership of machineguns. For statutory purposes a machinegun is a gun that can automatically fire multiple rounds of ammunition upon a single pull of the trigger. The statute was originally enacted as a revenue statute pursuant to Congress' taxing power. *See Sonzinsky v. United States,* 300 U.S. 506, 513, 57 S.Ct. 554, 555, 81 L.Ed. 772 (1937). It required the registration of machineguns in order to facilitate tax collection by the Treasury Department. The 1986 Act prohibited the possession of all machineguns that were not legally possessed (that is, registered) prior to the Act's effective date. *See Farmer v. Higgins,* 907 F.2d 1041, 1044 (11th Cir.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991).

■ Mr. Ross invites our attention to several cases that hold that, once the possession of machineguns became illegal, the registration and taxing requirement was effectively rendered meaningless. *See United States v. Dalton,* 960 F.2d 121 (10th Cir. 1992), *cert. denied,* — U.S. —, 114 S.Ct. 253, 126 L.Ed.2d 205 (1993); *United States v.*

*Rock Island Armory, Inc.*, 773 F.Supp. 117, 126 (C.D.Ill.1991).[9] Thus, submits Mr. Ross, "the registration requirement is unconstitutional because Congress removed the underlying basis for the statute." Appellant's Br. at 17.[10]

In *Rock Island Armory*, a defendant was prosecuted under §§ 5822 and 5861 for failing to register machine guns that were manufactured after the effective date of § 922(*o*) of the 1986 Act. 773 F.Supp. at 125. The defendant pointed out that after the 1986 Act took effect, the government no longer would allow the registration of machineguns that had not already been properly registered. Thus, submitted the defendant, it was being prosecuted for failing to perform an impossible action. The district court agreed and held that the registration and taxing provi-

sions of the earlier statute were impliedly repealed to the extent that they required actions that were no longer possible. In short, the court concluded that the 1986 Act "undercut the constitutional basis of registration which had been the rule since *Sonzinsky*." *Rock Island Armory*, 773 F.Supp. at 125.

In *United States v. Dalton*, 960 F.2d 121 (10th Cir.1992), the Tenth Circuit followed the same reasoning. The court held that "[a]s a result of section 922(*o*), compliance with section 5861 is impossible." *Id.* at 126. Consequently, the court vacated the defendant's conviction on the ground that it was "constitutionally infirm." *Id.* Five months later, the Tenth Circuit again had occasion to consider the intersection of § 922(*o*) and the

9. Mr. Ross also invites our attention to a trilogy of cases decided in 1921. *See Ketchum v. United States*, 270 F. 416, 419 (8th Cir.1921); *Maresca v. United States*, 277 F. 727, 747 (2d Cir.1921), *cert. denied*, 257 U.S. 657, 42 S.Ct. 183, 66 L.Ed. 420 (1922); *United States v. Yuginovich*, 256 U.S. 450, 463, 41 S.Ct. 551, 553, 65 L.Ed. 1043 (1921). These cases all presented the question whether the Eighteenth Amendment and the Volstead Act (prohibition) impliedly repealed prior legislation that imposed registration and taxation requirements on the manufacture and sale of liquor. Although the cases do ultimately conclude that the prior revenue statutes were impliedly repealed, they do not help Mr. Ross. In *Yuginovich*, the Supreme Court explicitly noted:

> Congress may under the broad authority of the taxing power tax intoxicating liquors notwithstanding their production is prohibited and punished, we have no question.
>
> .   .   .   .   .
>
> It is, of course, settled that repeals by implication are not favored. It is equally well settled that a later statute repeals former ones when clearly inconsistent with the earlier enactments.

*Yuginovich*, 256 U.S. at 462–63, 41 S.Ct. at 553–54. Thus, the cases expressly found that Congress *intended* to effect an implied repeal. Consequently, Mr. Ross' case involves an independent analysis of whether the two statutes involved can be reconciled.

10. An unconstitutional law is void and thus conviction under it violates due process. *See Ex parte Royall*, 117 U.S. 241, 248, 6 S.Ct. 734, 738, 29 L.Ed. 868 (1886); *Johnson v. United States*, 805 F.2d 1284, 1288 (7th Cir.1986). Although we have never addressed the matter and need not do so today, there is some authority for the proposition that such an error, if it exists, is not subject to waiver. *See United States v. O'Mara*,

827 F.Supp. 1468, 1472 (C.D.Cal.1993) (claim that indictment alleging violation of § 5861(d) fails to state an offense against the United States is a claim of defective jurisdiction and is not subject to procedural default rules); *accord Gonzalez v. Abbott*, 967 F.2d 1499 (11th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 257, 126 L.Ed.2d 210 (1993).

This approach is an exception to the general rule that failure to present this argument in direct proceedings constitutes a waiver absent a showing of cause for the procedural default and actual prejudice. *See Salberg v. United States*, 969 F.2d 379, 381 (7th Cir.1992) (failure to raise a constitutional challenge at trial or on direct appeal bars a defendant from raising such issues in a federal habeas corpus proceeding absent a showing of cause for the procedural default and actual prejudice). Mr. Ross does not rely on this exception, but maintains that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). Mr. Ross asserts that the caselaw forming the basis for his legal theory was not reasonably available to his counsel in 1990, when his case was on direct review. He stresses the fact that *Farmer v. Higgins*, 907 F.2d 1041 (11th Cir.1990), *United States v. Rock Island Armory*, 773 F.Supp. 117 (C.D.Ill.1991), and *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992), were all decided after his initial conviction. Prior to Mr. Ross' conviction there was no caselaw holding that any portion of § 5861 had been repealed by the 1986 Act. We cannot accept this argument. The authorities available to counsel in the cases cited by Mr. Ross were equally available to him during the pendency of his direct appeal.

registration requirements in § 5861 in *United States v. Staples*, 971 F.2d 608 (10th Cir. 1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2412, 124 L.Ed.2d 635 (1993). In *Staples*, the court held that the due process clause did not prohibit conviction for possession of a machinegun that could have been registered before the effective date of the § 922(*o*) ban. The court explicitly distinguished *Dalton* because the weapon involved in *Dalton* was not possessed until three years after the § 922 ban and thus could not have been properly registered. In contrast, the machinegun in *Staples* was purchased three years before the § 922 ban. Thus, concluded the court, if the defendant had properly registered the machinegun before 1986, he would have fallen within the language of the grandfather clause.[11]

The Fourth Circuit rejected the rationale of *Rock Island Armory* and *Dalton* in *United States v. Jones*, 976 F.2d 176 (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993). In *Jones*, the defendant had modified two shotguns to function as machineguns and had sold them to a federal undercover officer in violation of the National Firearms Act (the "old Act"). Judge Niemeyer rejected Jones' arguments that § 922(*o*) made compliance with § 5861 impossible and thus effectively repealed the earlier registration requirements.

> "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for repeal by implication is when the earlier and later statutes are *irreconcilable*." ... [T]he two statutes are not irreconcilable because, despite Jones' assertions to the contrary, Jones *can* comply with both acts. While

he may not be able to register newly-made machine guns in which he deals, neither act requires him to deal in such guns. Simply put, Jones can comply with both acts by refusing to deal in newly-made machine guns.... *What Jones is really complaining about is that the amendment to the Gun Control Act effectively rendered possession of certain guns automatic violations of both the Gun Control Act and the National Firearms Act. Yet there is nothing either inconsistent or unconstitutionally unfair about Congress' decision to do so.* And, faced with two equally applicable penal statutes, there is nothing wrong with the government's decision to prosecute under one and not the other, so long as it does not discriminate against any class of defendants.

*Jones*, 976 F.2d at 183 (citation omitted) (emphasis added). Mr. Ross asserts that *Jones* is distinguishable because, although it did reject arguments that § 5861(c), (e), and (j) were rendered unconstitutional by the 1986 Act, technically it did not address § 5861(d) at all. We disagree. Section 5861(c) makes it illegal to possess a firearm manufactured in violation of the chapter; section 5861(d) makes it illegal to possess an unregistered firearm; section 5861(e) makes it illegal to transfer a firearm in violation of the chapter; and section 5861(j) makes it illegal to transport in interstate commerce any unregistered firearm. In short, all four sections are attempting to accomplish the same task—to ensure that the government may carefully track and regulate machineguns. We find the analysis applied in *Jones* to be well-reasoned and to be equally as applicable to § 5861(d).[12]

---

**11.** In *United States v. Kurt*, 988 F.2d 73 (9th Cir.1993), the Ninth Circuit addressed the effect of § 922(*o*) upon the validity of § 5861. As did the Tenth Circuit in *Staples*, the court distinguished *Dalton* on the ground that Kurt's gun could have been properly registered before May 1986. Subsequently, in *United States v. O'Mara*, 827 F.Supp. 1468 (C.D.Cal.1993), the United States District Court for the Central District of California rejected the *Dalton* and *Rock Island Armory* analysis and found that § 5861(d) and § 922(*o*) are not unconstitutionally inconsistent.

**12.** Additionally, Mr. Ross has invited our attention to the fact that the circuits are split regard-

ing whether actual knowledge of a machinegun's physical properties is an essential element of the possession of an unregistered machinegun offense under § 5861(d). He has also correctly noted that the Supreme Court has recently agreed to resolve the conflict and has granted certiorari to hear *Staples*, 971 F.2d 608. This circuit has resolved the issue and pending further direction from the Supreme Court we will not revisit it today. Indeed, the issue was settled in this court almost three years ago in Mr. Ross' first appeal in this very case. *Ross*, 917 F.2d 997.

## Conclusion

For the foregoing reasons, the revocation of probation is reversed. In all other respects, the judgment of the district court is affirmed.

REVERSED in part; AFFIRMED in part.

ILANA DIAMOND ROVNER, Circuit Judge, concurring in the judgment.

I agree that we must affirm the district court's revocation of supervised release on count I and reverse the revocation of Ross' probation on count II. I am constrained to write separately, however, because the majority countenances what, to my mind, is a violation of Ross' fifth amendment rights. I thus join the court's judgment but not Part 2 of its opinion.

I would affirm the revocation of Ross' supervised release on the ground that he failed to appear for appointments with his probation officer and lied to the district court about his access to an automobile. The district court observed at the October 20, 1992 hearing that this constituted "a separate and independent basis" for the probation revocation (Oct. 20, 1992 Tr. at 12), and the government asks that we affirm on this ground without reaching the fifth amendment question. The majority has "no doubt that this . . . could be an adequate basis for the [district] court's action" but then refuses to so limit its decision, expressing "substantial doubt" that the district court ultimately deemed these alternative grounds "independent and adequate . . . for the revocation of [Ross'] supervised release." (*Ante* at 1189 (emphasis added).) I respectfully submit that whether or not the district court ultimately relied on this ground is inconsequential, as we may affirm on any basis that finds support in the record (*United States v. Ewings*, 936 F.2d 903, 907 (7th Cir.1991); *United States v. Thomas*, 934 F.2d 840, 843 (7th Cir.1991)), and we all agree that revocation was appropriate on this independent ground. If we are able to resolve an appeal without reaching a difficult constitutional question, we certainly should do so. *See, e.g., Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 262 (7th Cir.1989) ("It is well established that federal courts must not rule on constitutional issues where other, nonconstitutional dispositive grounds are available."); *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir.1987).

The majority has nonetheless reached the constitutional issue, and in my view has resolved it incorrectly. The fifth amendment plainly forbids the revocation of supervised release in response to Ross' invocation of his privilege against self-incrimination. It is well established that the fifth amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). As the Court explained in *Minnesota v. Murphy*, 465 U.S. 420, 435, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984):

> A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. *The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution.*

(emphasis added). Indeed, *Murphy* observed that the Court's precedents "have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.* at 438, 104 S.Ct. at 1148; *see also United States v. Frierson*, 945 F.2d 650, 661 (3d Cir.1991), *cert. denied*, ––– U.S. –––, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992); *United States v. Perez-Franco*, 873 F.2d 455, 463 (1st Cir.1989). That "classic penalty situation" is precisely what confronted Ross here. *See Murphy*, 465 U.S. at 435, 104 S.Ct. at 1146.

Justice Marshall's dissent in *Murphy* synthesizes the fifth amendment principles announced by the Court: [1]

> [T]he power of a State to compel a probationer to answer a given question varies depending upon the manner in which the probationer's answer might incriminate him. If a truthful response might reveal that he has violated a condition of his probation but would not subject him to criminal prosecution, the State may insist that he respond and may penalize him for refusing to do so. By contrast, if there is a chance that a truthful answer to a given question would expose the probationer to liability for a crime different from the crime for which he has already been convicted, he has a right to refuse to answer and the State may not attempt to coerce him to forgo that right. As the majority points out, *if the answer to a question might lead both to criminal sanctions and to probation revocation, the state has the option of insisting that the probationer respond, in return for an express guarantee of immunity from criminal liability.* Unless it exercises that option, however, the State may not interfere with the probationer's right "to remain silent unless he chooses to speak in the unfettered exercise of his own will," *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

*Id.* at 441–42, 104 S.Ct. at 1150 (Marshall, J., dissenting) (emphasis added); *see also id.* at 435 & n. 7, 104 S.Ct. at 1146 & n. 7 ("Our cases indicate, moreover, that a state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, *so long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incarceration* ") (emphasis added); *Mace v. Amestoy,* 765 F.Supp. 847, 850 (D.Vt.1991).

There is no question that Ross' response to the district court's inquiry could have led to a further criminal prosecution as well as to the revocation of supervised release. Ross was asked what he had done with a collection of over fifty guns. There are any number of possible criminal ramifications that might follow from Ross' response. Under *Murphy,* therefore, the district court could not revoke Ross' supervised release based on his failure to respond to the court's inquiry without first granting him immunity. *See Lefkowitz,* 414 U.S. at 84–85, 94 S.Ct. at 326; *United States v. Oliveras,* 905 F.2d 623, 627 n. 6 (2d Cir. 1990); *see also Asherman v. Meachum,* 957 F.2d 978, 986 (2d Cir.1992) (en banc) (Cardamone, J., dissenting). *Murphy* explains that once an individual asserts his fifth amendment right, "he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him' in a subsequent criminal proceeding." 465 U.S. at 429, 104 S.Ct. at 1143 (quoting *Maness v. Meyers,* 419 U.S. 449, 473, 95 S.Ct. 584, 598, 42 L.Ed.2d 574 (1975) (White, J., concurring in the result) (emphasis in original)). Ross' counsel requested such a grant of immunity here, but it was not forthcoming. By revoking supervised release without first securing a grant of immunity from the government, the district court plainly infringed Ross' constitutional rights.

The majority avoids this sensible conclusion by contending that the district court's only interest in posing its question was to verify Ross' compliance with the legitimate conditions of his parole. The majority thus observes that "[t]here is not the whisper of an echo in this record to suggest that the district court had an interest in ferreting out incriminating admissions to facilitate the further prosecution of the defendant." (*Ante* at 1191.) Yet I find the district court's intentions irrelevant. The fifth amendment analysis necessarily turns on the incriminatory potential of Ross' answer, not on the purpose of the court's question. The district court, after all, is not a prosecutor; it is the government that would decide what charges, if any, to bring against Ross based on his answer to the inquiry. In any event, so long as the court's question calls for a response that could implicate the defendant in additional

---

**1.** Justice Marshall dissented not because he disagreed with those principles, but because he thought the majority had applied them erroneously in Murphy's case. *Id.* at 442, 104 S.Ct. at 1150 (Marshall, J., dissenting).

criminal conduct, the defendant need not respond unless and until he is granted immunity.

The majority relies on the Second Circuit's en banc decision in *Asherman* to support its conclusion, and I agree that case is analytically similar to this one. (*See ante* at 1189.) The *Asherman* court concluded that an adverse consequence may constitutionally be visited upon a "home detention" prisoner "so long as the consequence is imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right." 957 F.2d at 982. Applying that rationale here, the majority emphasizes the district court's legitimate informational need in determining whether Ross was abiding by the conditions of his supervised release. The majority thus concludes that the district court posed its inquiries merely to ensure compliance with the legitimate conditions of Ross' parole and that the revocation of supervised release had nothing to do with Ross' invocation of his fifth amendment rights. (*Ante* at 1191.) As the dissenters in *Asherman* observed, however, this is nothing more than a "tortured attempt" to avoid the result compelled by the fifth amendment. 957 F.2d at 988 (Cardamone, J., dissenting). I agree with Judge Cardamone that there can be no principled distinction between invocation of the fifth amendment and the failure to respond to a relevant inquiry:

> [T]he two are inextricably intertwined. Asherman's failure to answer a relevant inquiry was solely and directly the result of his invocation of the right to remain silent. In other words, his assertion of [the] right did not constitute a complete refusal to respond to relevant questions, as evidenced by his appearance at the appointed time to undergo the evaluation; instead Asherman refused to respond only insofar as to do so could incriminate him.

*Id.* (Cardamone, J., dissenting). The majority's view essentially means that the right guaranteed by the fifth amendment automatically yields in the face of any relevant inquiry. This simply cannot be so, for the fifth amendment is itself "a fundamental limitation on a governmental agency's ability to conduct such an inquiry." *Id.* at 986, 988 (Carda-

mone, J., dissenting); *see also Oliveras,* 905 F.2d at 628 ("citizens may not be forced to incriminate themselves merely because it serves a governmental need"); *Mace,* 765 F.Supp. at 852 (even if "the state has a legitimate rehabilitative purpose in demanding full disclosure, ... that does not make the disclosure any less incriminating"). It seems to me that this is the clear lesson of *Murphy.*

In my view, when Ross refused to answer a relevant inquiry on fifth amendment grounds and it was clear that his answer might have further criminal ramifications, the right to avoid self-incrimination trumped the governmental interest in the substance of the inquiry. Adverse action such as the revocation of probation or of supervised release was therefore prohibited unless the government provided an express grant of immunity. Thus, if it were necessary to reach the fifth amendment issue to affirm the revocation of supervised release, I would hold that Ross' fifth amendment rights were violated.

Furthermore, I also cannot join Part 4 of the Court's opinion, as the majority expressly states in Part 3 that the district court found Ross' motion to vacate sentence inappropriate because the issue raised there was beyond the scope of the November 12 hearing and should be raised in a separate proceeding under 28 U.S.C. § 2255. (*Ante* at 1192.) The majority thus concludes that the district court did not abuse its discretion in refusing to consider Ross' motion. (*Id.*) The court nonetheless proceeds to reach the merits of Ross' argument that his conviction was constitutionally infirm. Again, the court has reached out to address a constitutional question that is unnecessary to resolution of this appeal and that, in this instance, is not properly before us. For these reasons, I join Part 3 but respectfully decline to join Part 4 of the Court's opinion.